RACHEL LEDERMAN, SBN 130192
Alexsis C. Beach & Rachel Lederman, Attorneys
P.O. Box 40339
San Francisco, CA 94140-0339
(415) 282-9300; fax (510) 590-9296
rachel@bllaw.info

R. MICHAEL FLYNN, SBN 258732
Flynn Law Office
1720 Broadway, Suite 430
Oakland, California 94612
Phone: (510) 893-3226, fax: (866) 728-7879
michael@flo-law.com

Attorneys for plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASMINE GAFFETT, KIERRA BROWN, and TOSHUA SEARS, Individually and on behalf of a class of all persons similarly situated, <br><br> v. <br><br> CITY OF OAKLAND, SUSAN MANHEIMER, LERONNE ARMSTRONG, ALAMEDA COUNTY, GREGORY J. AHERN, DOES 1-100. | **CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **42 U.S.C. § 1983** <br><br> **JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.    Police have been targeting, brutalizing, and killing Black people since the inception of law enforcement in the United States, and Oakland's police force has

shown a demonstrable history of violence against Black people and other people of color in Oakland. This action arises out of protests across the nation in response to the May 25, 2020, murder of George Floyd by Minneapolis Police Department officers. The events in Minneapolis, soon after the deaths of Breonna Taylor and Ahmaud Arbery, brought out millions of people around the country to condemn the deaths of Black and Brown people by law enforcement in one of the largest social justice movements in the United States history.[1]

2.      In Oakland, thousands took to the streets on a daily basis starting on May 29, 2020, to make their viewpoint known that police brutality and institutionalized racism must end. The Oakland Police Department ("OPD"), and its mutual aid partner Alameda County Sheriff Office ("ACSO"), brutally repressed the Oakland demonstrators, targeting protestors with highly dangerous impact munitions (also known as Specialty Impact Munitions "SIM", Kinetic Impact Projectiles "KIP", or Projectile Impact Weapons "PIW"), explosive grenades and chemical agents, and wrongful arrests.

3.      This misconduct by OPD and ACSO violated the plaintiffs' constitutional rights and the CITY OF OAKLAND Police Department's own Crowd Control and Crowd Management Policy. Said Policy was adopted by the CITY OF OAKLAND and OPD as part of the federal court settlement orders in four prior federal lawsuits arising from mass injuries caused by OPD's and assisting agencies' (including ACSO's) misuse of these weapons and wrongful mass arrests at demonstrations: *Coles / Local 10, ILWU, v. City of Oakland*, Nos. C03-2961 TEH, C03-2962 TEH; *Spalding, et al. v. City of Oakland*, C11-02867 TEH, and *Campbell, et al. v. City of Oakland*, C11-05498 JST. (See Exhibit A, OPD Training Bulletin III-G, which is the Crowd Control and Crowd Management Policy as promulgated to the police force.)

---

[1] *Black Lives Matter May Be the Largest Movement in U.S. History*, NY Times, 3 Jul. 2020 https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html, last visited Feb. 2021.

4.      This is a civil rights action for damages, injunctive and declaratory relief arising from the unconstitutional OPD and ACSO violence toward demonstrators on May 29 and June 1, 2020.

## II. JURISDICTION AND VENUE

5.      This action seeks damages and injunctive relief under 42 U.S.C. § 1983.  This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 and 1343. It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6.      Venue properly lies within this District under 28 U.S.C. § 1391(b). The named defendants perform their official duties in this District, and the events and omissions giving rise to plaintiffs' claims occurred in this District.

7.      Plaintiffs JASMINE GAFFETT, KIERRA BROWN and TOSHUA SEARS have filed administrative claims with the City of Oakland and with Alameda County, in compliance with California Government Code § 910 et seq. The City of Oakland denied plaintiffs' claim on February 1, 2021. More than 45 days have elapsed since the claim against Alameda County was submitted on October 16, 2020; therefore that claim is deemed denied.

## III. INTRADISTRICT ASSIGNMENT

8.      Pursuant to Local Rule 3-2(e), this action is properly assigned to the Oakland or San Francisco divisions of this Court.

## IV. PARTIES

### A. PLAINTIFFS

9.      Plaintiff JASMINE GAFFETT is an adult resident of Alameda County, California.

10.     Plaintiff KIERRA BROWN is an adult resident of Contra Costa County, California.

11.     Plaintiff TOSHUA SEARS is an adult resident of Alameda County, California.

### B. DEFENDANTS

12.     Defendant CITY OF OAKLAND is a municipal corporation, duly organized and existing under the laws of the State of California.

13.     Defendant SUSAN MANHEIMER was at all times relevant herein, employed by defendant City of Oakland as the Interim Chief of Police, and was acting within the course and scope of that employment at all such times. At all material times, defendant MANHEIMER was the final policy making official for the Oakland Police Department (OPD), ultimately responsible for all policies, procedures or omission of procedures, supervision, and training of OPD employees and for supervision of assisting agencies brought in as mutual aid to OPD during Oakland events.

14.     Defendant LERONNE ARMSTRONG is employed by defendant City of Oakland as its current Chief of Police, and was at all times relevant herein, its Deputy Chief of Police, and was acting within the course and scope of that employment at all such times. At all material times, defendant ARMSTRONG supervised the response to the June 1, 2020, demonstration, by the CITY OF OAKLAND Police and the assisting agencies brought in as mutual aid to OPD during the June 1, 2020, demonstration.

15.      Defendant ALAMEDA COUNTY is a political and administrative subdivision of the State of California.

16.     Defendant GREGORY J. AHERN is, and was at all times relevant herein, the elected Sheriff and Coroner of Alameda County. Defendant Ahern supervises the Alameda County Sheriff's Office (ACSO) and all its personnel. At all material times, defendant Ahern was the final policy making official for the ACSO, ultimately responsible for all policies, procedures or omission of procedures, supervision, and training of ACSO employees.

17.     The individual defendants are sued in their individual capacities.

18.     The DOE defendants include other individuals who supervised and/or participated in the conduct complained of herein. Plaintiffs are informed and believe and therefore allege that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants proximately caused said incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed

negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

19.     In doing the acts alleged herein, defendants, and each of them, acted within the course and scope of their employment.

20.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under color of law.

21.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted as the agent, servant, employee and/or in concert with each of said other defendants.

**V. FACTS**

22.     On May 25, 2020, Minneapolis police officers killed George Floyd, a 46-year-old Black Minneapolis resident. A white police officer knelt on Mr. Floyd's neck for nearly nine minutes while three other officers observed. Mr. Floyd died calling out for his mother and begging for his life as his death was recorded by passersby. The recording was shared on multiple media platforms for all the world to witness.

23.     In the days and weeks following Mr. Floyd's death, people across the country flooded into streets demanding an end to police brutality against Black people; protesting the deaths of Mr. Floyd, Breonna Taylor, Ahmaud Arbery, and countless others at the hands of police, through vigils, demonstrations, and public gatherings.

24.     These constitutionally protected and essential protests occurred and continue amid the COVID-19 pandemic. Public health officials advised people to wear masks and to stay six feet apart to minimize the spread of the virus.

25.     In anticipation of the Oakland protest organized for the evening of May 29, 2020, attorneys of record for plaintiffs in the prior crowd control settlements emailed Chief Manheimer, Assistant Chief Darren Allison, Deputy Chiefs Leronne Armstrong and Roland Holmgren, Mayor Libby Schaaf, and City Attorney Barbara Parker to remind them of the City of Oakland's and the OPD's legal obligation to comply with

the OPD Crowd Management and Crowd Control Policy in policing anticipated demonstrations (Exhibit B, May 29, 2020 Letter).

26.     Specifically, the May 29, 2020 Letter reminded OPD and City of Oakland officials that the federal court settlement agreements and orders in *Spalding, et al. v. City of Oakland*, C11-02867, and *Campbell, et al. v. City of Oakland*, C11-05498, mandate adherence to the Crowd Control Policy, promulgated as OPD Training Bulletin III-G, in all crowd situations, and require OPD and the City to meet and confer with plaintiffs' counsel before making any material change to TB III-G and associated training outlines. (Exhibits A and B.)

27.     The May 29, 2020 Letter specifically mentioned that the Policy prohibits certain weapons and types of force in the crowd context and restricts others. Chemical agents and hand thrown pyrotechnic devices may not be used in crowd events without the approval of the Incident Commander, absent exigent circumstances. (Exhibit A, ¶ V.H.4, p. 13, and Exhibit B.) Hand thrown pyrotechnic devices such as CS Blast grenades may not be thrown directly into a crowd. They must be deployed to explode at a safe distance from the crowd to minimize the risk of serious injury. (Exhibit A, ¶ V.H.5, p. 14, and Exhibit B.) The May 29, 2020 Letter also mentioned that these devices have caused serious burns and permanent hearing loss when used in Oakland crowds. (Exhibit B.)

28.     The May 29, 2020 Letter specified that, according to Oakland's own policy, "Specialty Impact Less-Lethal Munitions (SIM) such as so called "foam" or "sponge" rounds and bean bags may *never* be used for crowd control or dispersal. In a crowd situation, the Policy requires a different standard for SIM than on patrol. SIM may only be used against a specific individual who is engaging in conduct that poses an *immediate threat of loss of life or serious bodily injury* to him or herself, officers, or the general public or who is engaging in substantial destruction of property which creates an *immediate risk to the lives or safety* of other persons. In such instances, SIM shall be used *only* when other means of arrest are unsafe and when the individual can be targeted without endangering other crowd members or bystanders, i.e. when the officer

has a clear shot – not in the midst of a crowd. (Exhibit A, ¶ VI.F.2, p. 15 and Exhibit B.)

29.    An OPD Chief's Memorandum to all personnel further clarifies OPD's policy regarding use of SIM at crowd events, stating: "*The mere fact that an individual is picking up, about to throw, or throwing a chemical agent canister previously deployed by OPD, or other object, does not automatically constitute an immediate threat of loss of life or serious bodily injury. Members must consider the size and composition of the object and the distance from which it is being thrown*." (Exhibit C, Chief's Nov. 19, 2014 Memo.)

30.    The Chief's Memorandum goes on to clarify that "*Even when an individual's conduct does constitute an immediate threat of loss of life or serious bodily injury, Direct Fired SIM shall be used only when other means of arrest are unsafe and when the individual can be targeted without endangering other crowd members or bystanders. The member using SIM must have a shot the member reasonably believes can be taken and will only impact the intended target, given consideration of how close the individual is to others, whether crowd members are moving, and factors that may affect visibility and the accuracy of shot placement, such as chemical agent deployment*." (Exhibit C.)

31.    The Chief's Memorandum also states that "*Medical attention shall be provided to any individual struck by SIM. All officers at the scene are responsible for ensuring that medical attention is available for injured persons and for people affected by chemical agents.*" (Exhibit C.)

32.    OPD and the City adopted these restrictions to prevent another tragedy like the permanent brain damage sustained by Scott Olsen, a young veteran who was accidentally struck in the head with a police "bean bag" while peacefully standing at a

2011 demonstration. Mr. Olsen received a $4.5 million settlement from the City, but will never regain full mental function."[2]

33.     It is well recognized that impact munitions or SIM, also known as KIP or PIW, can cause injuries ranging from localized contusions to severe organ damage and death. Data from 1,984 SIM injuries revealed that 3% died and 15.5% were permanently disabled as a result of being shot with SIM. (Haar RJ, Iacopino V, Ranadive N, et al. *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review.* BMJ Open 2017;7:e018154. doi:10.1136/bmjopen-2017-018154; pp. 2-5.)

34.     Impact munitions caused at least 115 head injuries across the United States during protests following the killing of George Floyd. (Physicians for Human Rights, *Shot in the Head*, Sept. 14, 2020, https://storymaps.arcgis.com/stories/29cbf2e87b914dbaabdec2f3d350839e accessed Apr. 18, 2021.)

35.     In addition to the provisions mentioned in the May 29, 2020, letter, the Oakland Crowd Control Policy and OPD Training Bulletin III-G govern OPD's use of mutual aid at a demonstration or crowd event. They provide, inter alia,

> …[T]he [Incident Commander] shall be responsible for ensuring to the extent possible that mutual aid agencies:
>
> 1. Are briefed and in agreement with OPD's Unity of Command structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control and dispersal;
> 2. Are briefed on OPD's policy on prohibited weapons and force;
> 3. Do not bring or use any weapons or force that is prohibited under OPD's policy;
> 4. Are provided a copy of OPD's Crowd Control Policy and Use of Force policies;

---

[2]*Olsen v. City of Oakland*, No. C12-6333 SI; https://www.sfgate.com/crime/article/Occupy-protester-wounded-by-Oakland-police-gets-5337743.php.

5.  Are not assigned to front-line positions or used for crowd intervention, control or dispersal unless there is a public safety emergency….

(Exhibit A, ¶ IX, pp. 20-21.)

36.     The above provisions regarding mutual aid were added to the OPD Policy in 2013 as part of the aforementioned *Spalding* and *Campbell* settlement agreements, after OPD and mutual aid agencies such as ACSO caused many injuries, including at least one near-fatal injury, through their use of SIM and hand-thrown pyrotechnic grenades during the Occupy Oakland demonstrations in 2011. Following these events, the City of Oakland had the Frazier Group conduct an independent investigation, and adopted its report, findings and recommendations. These included, inter alia, that Mutual Aid officers should not be comingled with OPD officers on the front lines, "even under extreme conditions", but rather, assigned specific missions to be carried out with department and unit integrity under the direction of OPD. (Frazier Report, June 14, 2012, p. 13.)

### The May 29 Oakland Demonstration: Jasmine Gaffett

37.     At about 8 p.m. on May 29, 2020, demonstrators assembled at Broadway and 14th Street in Oakland to express their views regarding the policing system that has systematically killed Black people and other people of color. Other participants came with medical supplies, water, and other aid for the demonstrators. And others, including journalists, legal observers, and passersby, simply observed the demonstration. Most of the demonstrators and observers wore masks and observed social distancing.

38.     The defendants would ultimately inflict the same sort of ruthless violence on the demonstrators that the demonstrators were protesting, and that is prohibited by the OPD Crowd Control and Crowd Management Policy: indiscriminately dispersing tear gas and shooting impact munitions into the crowd, and detonating explosive grenades to cause panic and disorientation. (See Exhibit A.)

39.     On May 29, 2020, plaintiff Jasmine Gaffett attended the demonstration in downtown Oakland to express her opposition to racist police violence and support for the Black Lives Matter movement.

40.     Some time after 9pm, OPD and ACSO officers, formed a line across Broadway near 7th Street in which officers from both departments were comingled on the front line -- exactly as the City of Oakland's own Frazier Report had found should not be done.

41.     Despite the fact that the crowd was largely peaceful, OPD declared the demonstration an unlawful assembly, without lawful basis. At the *same time*, the OPD and ACSO officers began being using CS Blast grenades and Stinger Grenades, and teargas, such that the crowd did not have a chance to disperse in compliance with the order before being subjected to the chemical agents and volley of small explosives -- which is explicitly prohibited by the OPD Policy. (Exhibit A, ¶ V.H.4.e, V.H.5.c, p. 14.) They also began shooting impact munitions into the crowd -- which is also explicitly prohibited by the OPD Policy. (Exhibit A, ¶ VI.F.2, p. 15: "*Direct Fired SIM may never be used indiscriminately against a crowd or group of persons even if some members of the crowd or group are violent or disruptive.*")

42.     Plaintiff Gaffett stood near the front of the crowd, closest to the police line, wearing a red bandanna. She chanted and expressed views critical of the police and their response to the demonstration. Ms. Gaffett and the rest of the crowd retreated when the police began teargassing and shooting, but when the chemical agent cleared, they came back to continue demonstrating against police violence.

43.     Ms. Gaffett, and others near her, were yelling at the police and telling them that what they were doing was wrong, but neither Ms. Gaffett, nor anyone near her, were throwing anything, physically or verbally threatening the police, or trying to breach the police line.

44.     Then, without warning, DOE OPD and/or ACSO officers shot Ms. Gaffett twice in the leg, in quick succession, with impact munitions. Ms. Gaffett turned around and tried to run away from the police, but the DOE officers aimed at her and deliberately shot her again and again, while she fled. DOE OPD and/or ACSO defendants shot Ms.

Gaffett a total of at least twenty times, all over her body. After the first two shots, the DOE defendants kept shooting Ms. Gaffett from behind as she ran from them.

45.   Ms. Gaffett never presented any threat whatsoever to any of the OPD or ACSO officers or to anyone else. There was no justification for the defendants to use any force on her, and thus the twenty-plus shots with highly dangerous impact munitions were completely unnecessary and unlawful.

46.   Ms. Gaffett finally escaped further fire by lying on the ground behind a utility box. No OPD or ACSO officer offered her any first aid or summoned medical aid for her despite the fact that the shooting occurred in full view of the entire line of OPD and ACSO officers. This, too, violated the OPD Policy. (Exhibit A, ¶ VI.F.2.c, p. 15: "*Any person struck by a round shall be transported to a hospital for observation and any necessary treatment. Ambulance service, if required, shall be ordered per Department General Order I-4, AMBULANCE SERVICE. First aid, when necessary, shall be administered per Training Bulletin III-K, FIRST AID.*")



47.   A nurse who was acting as a medic for injured demonstrators gave Ms. Gaffett aid, and she was eventually able to get home.

48.   Ms. Gaffett was covered with large welts. Among other places, she was hit close to her spleen, kidneys, spine, and groin, and in her right ring finger.

49.   The OPD Crowd Control Policy prohibits officers from discharging SIM at a person's left armpit, spine, kidneys, or groin unless deadly force would be justified. (Exhibit A, ¶ VI.F.2.h, p. 16.)

50.   In severe pain, Ms. Gaffett could barely move for two days, requiring assistance for the most basic functions. She remained laid up at home, in pain, for two weeks, but

because she had been laid off due to the pandemic and had no health insurance, she did not immediately seek healthcare.

51.     When Ms. Gaffett was seen at a clinic two weeks after being shot she still had visible ecchymosis with hard, swollen lumps, and her right ring finger was found to be fractured.

### The June 1 Oakland Demonstration: Toshua Sears and Kierra Brown

52.     On June 1, 2020, young people including many Black and Brown high school students and others held a march to protest racist police violence. The march started at Oakland Technical High School, and was planned to end with speeches at the Oakland Police Administration Building. At the onset, the organizers announced that the protest was peaceful and explicitly called for "no destruction."

53.     Despite the fact that the march was peaceful, Alameda County declared an 8pm curfew. Also, on June 1, 2020, the City of Oakland declared a local emergency and 8 p.m. to 5 a.m. curfew.

54.     On information and belief, defendant LERONNE ARMSTRONG was the Incident Commander in charge of the OPD and mutual aid officers' response to the June 1, 2020, demonstration.

55.     Well prior to the curfew hour, Oakland and Alameda County officers formed lines blocking the demonstrators' path, forcing many of them to stop at Oscar Grant / Frank Ogawa Plaza rather than at the Police Administration Building.

56.     At approximately 5 p.m., after the march had already started, the County of Alameda and the City of Oakland began disseminating the message that a curfew would begin just three hours later.

57.     A smaller number of demonstrators continued from Oscar Grant Plaza towards the Police Administration Building. At Washington Street and 8th Street, the demonstrators met a line of police outfitted in full riot gear. The OPD 'kettled' the group via line formations and by way of their vehicles, blocking opportunities for egress.

58.     Without warning and before the curfew hour, the OPD and ACSO used chemical

weapons, threw explosive blast grenades and pyrotechnic devices, and shot impact munitions into the crowd of confined demonstrators, causing chaos. A dispersal announcement that many or most of the crowd could not hear or decipher was made a couple of seconds prior to the bombardment of chemical weapons, impact munitions and blast grenades. The police filled the entire block between 8th and 9th St. with a virtual wall of CS gas and smoke that impeded, rather than aided the demonstrators in dispersing as people had difficulty seeing and breathing, and impacted neighboring residents and business in this dense urban area of downtown Oakland.

59.     Plaintiffs KIERRA BROWN and TOSHUA SEARS each attended the June 1, 2020, march to protest racist police violence. Mr. Sears, who is Black, carried a sign, "All lives matter even ours".

60.     TOSHUA SEARS was in the area of 8th and Broadway, when well before 8pm, DOE OAKLAND Police and ALAMEDA COUNTY Sheriff officers blocked egress on three sides and at about 7:40pm, without warning, DOE OAKLAND and ALAMEDA COUNTY officers threw and shot chemical weapons, explosive grenades and SIM into the crowd. The crowd had been peaceful, and Mr. Sears did not hear the police give any warnings, orders or announcements, nor did he see any crowd activity that would justify the sudden use of force. Mr. Sears began to leave, when suddenly, he felt an enormous impact as a DOE OAKLAND Police or ALAMEDA COUNTY Sheriff officer shot him with an impact projectile in the right hip / buttock area.

61.     At first, Mr. Sears did not know if he had been shot with a live bullet or a so-called less lethal impact munition. It was terrifying. Chemical agent burned Mr. Sears' eyes, mouth and nose. It was hard to see and breathe. He hobbled away as best he could and called his wife to pick him up.



62.     At home, Mr. Sears washed his face and flushed his eyes out but his eyes swelled and remained swollen for days. His vision was affected as a result of chemical conjunctivitis caused by his exposure to the chemical agent. His hip remained extremely painful and developed a large, hard, swollen lump. It was hard to read or walk for some time. He could not sleep on his side. The lump and pain persisted for months.

63.     Mr. Sears never presented any threat whatsoever to any of the OPD or ACSO officers or to anyone else. There was no justification for the defendants to use any force on him, and thus both the shot and teargas were completely unnecessary and unlawful.

64.     Many other demonstrators were shot in the back as they were fleeing the shooting, explosive grenades and chemical weapons, only to be impeded by police lines kettling them from all directions.

65.     Public health and other medical experts have condemned the use of tear gas and other respiratory irritants on protesters as increasing the risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing, as well as by forcing those exposed to remove masks that have been contaminated.

66.     KIERRA BROWN was not at 8th and Broadway when the police used the chemical weapons, but went to 14th and Broadway after the march to help wash people's eyes who had been affected by the chemical agent. While Ms. Brown was doing this, the police approached and pushed the crowd further up Broadway. Ms. Brown was running toward 15th Street, which was what it seemed the police wanted the crowd to do, when a DOE OAKLAND or ALAMEDA COUNTY Sheriff officer shot her in the back of her

right leg.

67.     The OAKLAND and ALAMEDA COUNTY officers then trapped Ms. Brown and others between their lines and detained them, zip tying Ms. Brown and the others' hands. The kettling occurred before 8pm.

68.     DOE OAKLAND Police officers took Ms. Brown to a parking garage for processing before ultimately releasing her with a citation. She was never charged with any crime.

69.     Ms. Brown never presented any threat whatsoever to any of the OPD or ACSO officers or to anyone else. There was no justification for the defendants to use any force on her, and thus shooting her with highly dangerous SIM as she attempted to flee in response to the police action was completely unnecessary and unlawful.

70.     There was no probable cause to arrest Ms. Brown.

71.     That night, Ms. Brown's leg swelled and became numb from hip to ankle. She experienced uncomfortable tingling, and her leg developed a hard, swollen lump.

72.     Ms. Brown has never regained full sensation in her right leg and is at risk of losing mobility in her foot as a result of being shot by the DOE OPD or ACSO officer.



73.     Ms. Gaffett, Ms. Brown and Mr. Sears wish to continue to express their views on

police brutality and institutionalized racism by participating in public protests on the streets of Oakland, but are afraid that they will again be subjected to unlawful law enforcement violence and wrongful arrests.

74.     Defendants' actions on May 29 and June 1 violated every provision of the CITY OF OAKLAND's Crowd Management and Crowd Control Policy that the attorneys had warned about in their May 29 letter, and more. Oakland's own policy and the law are clear that verbal criticism or abuse of officers is not grounds for arrest or use of force. And while police may use force to defend themselves against an individual, it is both illegal and a violation of Oakland's policy to use impact munitions indiscriminately against a crowd.

75.     Defendants' actions on May 29 and June 1 violated the Policy's provisions which prohibit impact munitions and explosive grenades from being fired into crowds, and allow impact munitions to be used *only* against "a specific individual who is engaging in conduct that poses an immediate threat of loss of life or serious bodily injury to him or herself, officers, or the general public or who is engaging in substantial destruction of property which creates an immediate risk to the lives or safety of other persons" (Ex. A, ¶ VI.F.2.a, p. 15); provisions limiting the use of chemical weapons (Ex. A, ¶¶ V.H.4, V.H.5, pp. 13-14); and the requirement that OPD ensure mutual aid agencies do not bring or use any weapons or force that is prohibited under this policy, and not be assigned to front-line positions unless there is a public safety emergency (Ex. A, ¶ IX, p. 20). ACSO brought and used prohibited weapons including Stinger Grenades at the May 29 and June 1 events, violating Oakland's Policy, ¶ IX.3, and ACSO officers, including the DOE ACSO defendants, were comingled with OPD in front-line positions, violating ¶ IX.5 and the City of Oakland's Frazier Report findings.

76.     On May 29 and June 1, defendants also violated the Crowd Control Policy provision providing that "Any person struck by a round shall be transported to a hospital for observation and any necessary treatment." (Exhibit A, ¶ VI.F.2.c, p. 15.) None of the plaintiffs were offered medical aid by OPD or City of Oakland personnel.

77.     Following the May 29 – June 1 demonstrations, CITY OF OAKLAND officials

made a number of false and misleading statements to the public and media about the demonstrations and the actions of OAKLAND police officers and mutual aid agencies, fabricating and/or exaggerating reports of property destruction and supposed aggression by demonstrators while minimizing the police violence and injuries caused by the police.

78.     On being confronted with a photograph of Ms. Gaffett's injuries, which were inflicted by defendants on May 29, CITY OF OAKLAND officials stated falsely and publicly that the photograph was a hoax and depicted someone in Texas.

79.     Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious disregard and deliberate indifference for plaintiff's rights and safety, justifying an award of punitive damages.

80.     As a direct and proximate result of the conduct of defendants described herein, plaintiffs have been denied their constitutional, statutory and legal rights as stated below, and have suffered general and special damages, including but not limited to, pain, suffering, humiliation, emotional distress, fear, anxiety, disabilities, medical and related expenses, and other damages in amounts according to proof.

81.      Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs in amounts to be determined according to proof.

## VII. MONELL AND SUPERVISORY LIABILITY ALLEGATIONS

82.     The constitutional violations alleged herein were the proximate result of decisions, orders, acts and omissions of the CITY OF OAKLAND'S authorized policymakers including but not limited to defendant MANHEIMER; and ALAMEDA COUNTY's policymakers including but not limited to defendant AHERN.

83.     This included the decision for ALAMEDA COUNTY and the CITY OF OAKLAND to declare a curfew on June 1, which was unconstitutional as further explained below, and used as a pretext for wrongful arrests of Ms. BROWN and others.

84.     MANHEIMER, ARMSTRONG, AHERN, and DOE City officials and County officials caused the CITY OF OAKLAND police officers' and ALAMEDA COUNTY Sheriff's officers' constitutional violations complained of herein by failing to provide adequate policies, training, supervision, and command of their officers assigned to the

May 29- June 1, 2020, demonstrations to stop the officers from using excessive force, making wrongful arrests, and depriving plaintiff and class members of their First Amendment rights; and by approving the use of impact munitions, explosive grenades and pyrotechnic devices, and chemical weapons at the demonstrations, which resulted in such weapons being used in an unconstitutional, indiscriminate, unnecessary, and excessive manner. MANHEIMER, ARMSTRONG, AHERN, and DOE CITY OF OAKLAND and ALAMEDA COUNTY officials did this despite being well aware of the constitutional limitations on the use of force and arrests at demonstrations and of lawful crowd management and crowd control tactics, as set forth in the CITY OF OAKLAND's own Crowd Management and Crowd Control Policy.

85.     Plaintiffs further allege that the constitutional violations alleged herein were the proximate result of a repeated course of conduct by members of the OPD and ACSO tantamount to a custom, policy, pattern or repeated practice of condoning, ratifying and/or tacitly encouraging the abuse of police authority, and disregard for the constitutional rights of citizens, including the rights of the plaintiffs and class members.

86.     Plaintiffs are further informed and believe and thereon allege that the constitutional violations alleged herein were the proximate result of a custom, policy, pattern or practice of deliberate indifference by defendants CITY OF OAKLAND and ALAMEDA COUNTY to the repeated violations of the constitutional rights of citizens by defendants' law enforcement officers, which have included, but are not limited to, the repeated use of excessive force, and the repeated failure to properly and/or adequately train, supervise and/or discipline officers with respect to the use of excessive force, constitutional limitations on the use of force; the repeated failure by CITY OF OAKLAND and ALAMEDA COUNTY's high ranking officials, OPD and ACSO managers and/or supervisors to hold officers accountable for violating the rights of citizens; and/or other customs, policies and/or practices subject to continuing discovery.

87.     Plaintiffs are informed and believe that the constitutional violations alleged herein, to the extent they involved use of force by ALAMEDA COUNTY officers, were the proximate result of a policy, pattern and practice by CITY OF OAKLAND and its high

ranking police officials of allowing ALAMEDA COUNTY officers assisting OAKLAND with mutual aid to violate OAKLAND's Crowd Control Policy by bringing weapons to Oakland that are prohibited by the Policy, and using impact munitions, Stinger grenades and other force in a manner specifically prohibited by Oakland's Policy, in defiance of the *Spalding* and *Campbell* federal court settlement orders; and a policy, pattern and practice by ALAMEDA COUNTY and its Sheriff of refusing to follow OAKLAND's Crowd Control Policy while providing mutual aid to the CITY OF OAKLAND.

88.     Plaintiffs are informed and believe that defendants MANHEIMER, ARMSTRONG, AHERN, and DOE defendants, and/or each of them, caused the violation of the plaintiffs' constitutional rights as a result of their supervisory malfeasance and/or deliberate indifference to the need for more or different training, supervision and/or discipline of the CITY OF OAKLAND Police and ALAMEDA COUNTY Sheriff's Office personnel assigned to the subject incident, to prevent the foreseeable violation of plaintiffs' constitutional rights, as further discussed above.

## VIII. CLASS ACTION ALLEGATIONS

89.     Plaintiffs seek class certification pursuant to Fed.R.Civ.P. 23(a), and Fed.R.Civ.P. 23(b)(2), to pursue claims for injunctive and declaratory relief on behalf of themselves and all persons similarly situated.

90.     The class is defined as all persons who have in the past participated, presently are participating, or may in the future participate in, or be present at, demonstrations and crowd events within the City of Oakland in the exercise of their rights of free speech, assembly, association, petition, and of the press.

91.     This case satisfies the prerequisites of a Rule 23 class action. The class is so numerous that joinder of all members is impracticable. The class consists of hundreds or even thousands of people.

92.     There are questions of law and fact common to the class, in that the named plaintiffs claim that defendants' unlawful use of force and threats of force at the demonstrations described herein, were based on OPD and ACSO policies and orders that were unlawful and chilled their First Amendment rights.

93.    The questions of law and/or fact which predominate over any question affecting only individual class members include whether defendants improperly declared an unlawful assembly depriving peaceful participants of their First Amendment rights, whether defendants used excessive force against peaceful participants, whether defendants' motivation was to deprive participants of their First Amendment rights, and whether defendants engaged in racial, content and viewpoint-discrimination.

94.    By ordering and allowing officers to use unjustified force on the crowd at the demonstrations, and failing to implement policies prohibiting such use of excessive force and requiring OPD to brief mutual aid agencies on the Crowd Control and Crowd Management Policy, ensure they do not bring or use any weapons or force that is prohibited under this policy, and not assign mutual aid to front-line positions unless there is a public safety emergency, defendants have acted on grounds generally applicable to the class, so that injunctive and declaratory relief is appropriate respecting the class as a whole.

95.    The questions of law and fact common to the classes, which are outlined above, predominate over any questions affecting only individual members.

96.    The claims of the named plaintiffs are typical of the claims of the class in that the named plaintiffs and class members claim that their First Amendment rights have been chilled by the same misconduct of defendants and seek protection to bar the repeat of those violations in the future.

97.    The class representatives will fairly and adequately protect the interests of the class because they were subject to the unlawful law enforcement conduct complained of herein, and have no interests antagonistic to the class.

98.    The class representatives will fairly and adequately represent the common class interest. The class representatives have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the plaintiff class, and they will fairly and adequately protect the interests of the class.

99.    The class representatives are represented by counsel who are well-experienced in federal civil rights class action litigation and are familiar with the issues in this case.

100.    Counsel for the class representatives know of no conflicts among or between members of the class, the named plaintiffs, or the attorneys in this action.

101.    In accordance with FRCP Rule 23(b)(1)(A), the prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct for the defendants, thereby making a class action the superior method of adjudicating the controversy.

102.    In accordance with FRCP Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

103.    In accordance with FRCP Rule 23(b)(2), defendants have acted on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## IX. CLAIMS FOR RELIEF

### COUNT ONE – INJUNCTIVE RELIEF
### (First, Fourth And Fourteenth Amendments, 42 U.S.C. § 1983; California Constitution Articles 1 §§ 2, 3, 7, 13; Cal. Penal Code § 835.5; Civil Code § 52.1; and Civil Code § 815.6)

104.    Plaintiffs reallege and incorporate herein by reference the preceding paragraphs of this Complaint.

105.    The Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, using excessive force against hundreds if not thousands of protestors in retaliation for their protected First Amendment activity; imposing a curfew without accommodating the right to peaceable assembly and protest; declaring unlawful assemblies without adequate sound amplification and without providing adequate notice, means and opportunity to disperse before taking aggressive police action including the use of highly dangerous impact munitions / SIM, chemical weapons and explosive grenades; hitting large numbers of protestors with impact munitions / SIM, grenades, and using chemical weapons on them, all with unreasonable

and excessive force; failing to provide medical aid or decontamination to persons defendants shot and/or teargassed; and unlawfully arresting and detaining dozens of people.

106.   The CITY OF OAKLAND, through MANHEIMER, ARMSTRONG and the OPD, and ALAMEDA COUNTY, through AHERN and the ACSO, have failed to train their officers in the constitutional responses to demonstrations as revealed by the above allegations.

107.    Without intervention by this Court, the plaintiffs and class members, who have participated, observed or documented protest activities and wish to do so in the future, particularly related to police violence and racial justice, are at risk of having their rights violated in the future due to the defendants' demonstrated pattern of constitutional violations. The plaintiffs have no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

108.   The Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the class as a whole is appropriate.

109.   Defendants' policies, practices, customs, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to the plaintiffs, including but not limited to violations of their constitutional and statutory rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiffs intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in demonstrations, observation and documentation of demonstrations and police actions, and other expressive activities in the City of Oakland. Defendants' conduct described herein has created fear, anxiety and uncertainty among plaintiffs with respect to their exercise now and in the future of these constitutional rights.

110.   Specifically, plaintiffs are concerned that if they participate in, observe or document protest activities in the City of Oakland they will again be subjected to unreasonable and excessive force by OPD and ACSO.

111.    Plaintiffs are concerned that, when they are engaged in protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice of such curfews or in the event unlawful assemblies are declared; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, racially discriminatory, unreasonable or excessive force, injuring and terrifying protestors.

112.    Plaintiffs are also concerned that that if they participate in, observe or document protest activities in the City of Oakland they will be wrongfully detained and arrested by members of OPD and/or ACSO.

113.    Plaintiffs therefore seek injunctive relief from this court to ensure that plaintiffs and persons similarly situated will not suffer violations of their rights from defendants' illegal and unconstitutional policies, customs, and practices described herein.

114.    Plaintiffs seek injunctive relief in the form of an order prohibiting OPD and ACSO from using chemical weapons, explosive grenades, and impact munitions in crowds.

115.    Plaintiffs also seek injunctive relief in the form of an order requiring that defendants seal and destroy and records derived from the arrests for curfew violations, including but not limited to KIERRA BROWN, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from such arrestees, and identify all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

## COUNT TWO – DECLARATORY RELIEF

116.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

117.    An actual controversy exists between plaintiffs and defendants in that plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas plaintiffs are informed and believe that defendants contend that said policies, practices and conduct are lawful and constitutional. Plaintiffs therefore seek a declaration of rights with respect to this controversy pursuant to 28 U.S.C. §§

2201-2202.

## COUNT THREE – 42 U.S.C. § 1983
## VIOLATION OF FIRST AMENDMENT RIGHTS

118.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

119.    Plaintiffs' association with the anti-police violence/ racial justice demonstrations and observation and/or documentation of the police response were substantial and motivating factors for the defendants use of excessive force on all of the plaintiffs, and in the case of KIERRA BROWN and class members, arrest them. The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, chilled the plaintiffs' rights to freedom of speech, expression and association, under the First Amendment to the United States Constitution.

120.    The curfew order also violated and chilled the plaintiffs' First Amendment rights.

121.    As a result of Defendants' wrongful conduct, the plaintiffs suffered damages as alleged above.

122.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the class is entitled to relief from the potential that such violations will recur.

123.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT FOUR - 42 U.S.C. § 1983
## EXCESSIVE FORCE – U.S. Const., 4th and 14th Amds.

124.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

125.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs' rights to be free from excessive force, under the Fourth and Fourteenth Amendments to the United States Constitution.

126.    As a result of Defendants' wrongful conduct, the named plaintiffs suffered damages as alleged above.

127.    As a result of Defendants' wrongful conduct, and the potential that such conduct

will recur, the class is entitled to relief from the potential that such violations will recur.

128.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT FIVE –42 U.S.C. § 1983

### WRONGFUL ARREST – U.S. Const., 4th and 14th Amds.

### Plaintiff KIERRA BROWN and the CLASS Against All Defendants.

129.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

130.     There was no probable cause to support the arrests of KIERRA BROWN and the CLASS. Therefore, the acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs' rights to be free from wrongful arrest, under the Fourth and Fourteenth Amendments to the United States Constitution.

131.    Defendants' above-described conduct violated BROWN and the class members' rights to be free from unreasonable seizures under the Fourth Amendment and under the Fourteenth Amendment's due process clause and the state constitutional analogues.

132.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Class is entitled to relief from the potential that such violations will recur.

133.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT SIX – 42 U.S.C. § 1983

### VIOLATION OF THE FOURTEENTH AMENDMENT – EQUAL PROTECTION

134.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

135.    The named and DOE unidentified defendants subjected plaintiffs, many of whom are people of color and all of whom were protesting anti-Black racist police violence and in support of the movement for Black lives, to excessive force and/or unlawful detention and arrest, and/or suppressed their right to freedom of speech and assembly, with discriminatory motive and intent, and racial animus toward each and every plaintiff individually and as a group, either because of their identity and/or because of what they were protesting, and therefore violated plaintiffs' rights under the Equal Protection

Clause of the Fourteenth Amendment.

136.    As a result of Defendants' wrongful conduct, the plaintiffs suffered damages as alleged above.

137.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Class is entitled to relief from the potential that such violations will recur.

138.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT SEVEN – 42 U.S.C. § 1983**

**Conspiracy to Deprive Plaintiffs of Their Constitutional Rights**

139.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

140.    Each of the named and unidentified Defendant Officers along with Defendants CITY OF OAKLAND, CHIEF MANHEIMER, CHIEF ARMSTRONG, ALAMEDA COUNTY, and SHERIFF AHERN, acted in concert with each other and conspired by concerted action to accomplish an unlawful purpose by unlawful means.

141.    Each of the Defendants took concrete steps to enter into an agreement to unlawfully use excessive force on all Plaintiffs without notice or cause, and to detain and arrest certain Plaintiffs, knowing they lacked reasonable suspicion and/or probable cause to do so, and for the purpose of violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights.

142.    Defendants CITY OF OAKLAND, CHIEF MANHEIMER, CHIEF ARMSTRONG, ALAMEDA COUNTY, and SHERIFF AHERN, took concrete steps to enter into an agreement with DOE Defendants retroactively justify and cover-up Defendant Officers' unwarranted use of excessive force on all Plaintiffs and to unlawfully detain and arrest Plaintiffs for the purpose of violating Plaintiffs' First, Fourth, and Fourteenth Amendment rights.

143.    In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by using unwarranted, excessive force on all Plaintiffs, including, but not limited to, using CS Blast and Stinger grenades to break up

lawful demonstrations, shooting dangerous impact munitions at protestors, and firing chemical weapons into lawful crowds. Defendants also unlawfully arrested BROWN and class members knowing they lacked reasonable suspicion and/or probable cause to do so.

144. Defendants CITY OF OAKLAND, CHIEF MANHEIMER, CHIEF ARMSTRONG, ALAMEDA COUNTY, and SHERIFF AHERN, committed additional specific overt acts, misusing their powers as high-ranking officials for the purpose of violating Plaintiff's rights. They accomplished this goal by using ACSO officers brought in as mutual aid to police the Oakland demonstration and violate the OPD Crowd Control and Crowd Management Policy by using prohibited weapons and using force in a prohibited manner that violated the plaintiffs' constitutional rights; by issuing an unconstitutional curfew order without adequate notice and directing Defendant Officers to enforce the order against Plaintiffs. Further, they covered up Defendant Officers' constitutional violations of Plaintiffs' rights by falsely claiming that the police were under attack by "violent disruptors" and "professional agitators" who were "stacking up bottles" and "making Molotov cocktails" to throw at the police prior to the police use of force; and by falsely claiming that a photograph depicting plaintiff GAFFETT's injuries was a hoax and depicted someone in Texas.

145. Each individual named and unknown Defendant is therefore liable for the violation of Plaintiffs' rights the by any other individual Defendant.

146. As a direct and proximate result of the result of the Defendants' conspiracy, Plaintiffs suffered damages as alleged above.

147. Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT EIGHT – 42 U.S.C. § 1983
### Failure to Intervene

148. Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

149. During the events described above, the defendants stood by without intervening to prevent the violations of plaintiffs' constitutional rights heretofore alleged, even though the violations occurred in plain view of numerous CITY OF OAKLAND Police Officers

and ALAMEDA COUNTY Sheriff Officers and the defendants had the opportunity and duty to do so.

150.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for plaintiffs' clearly established constitutional rights.

151.    As a result of defendants' wrongful conduct, all of the plaintiffs suffered damages as alleged above.

152.    As a result of defendants' wrongful conduct, and the potential that such conduct will recur, plaintiffs and the class are entitled to relief from the potential that such violations will recur.

153.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT NINE – CALIFORNIA BANE ACT

154.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

155.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, constituted interference, and attempted interference, by threats, intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code § 52.1.

156.    As a result of defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

157.    As a result of defendants' wrongful conduct, and the potential that such conduct will recur, plaintiffs and the class are entitled to relief from the potential that such violations will recur.

158.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT TEN – CALIFORNIA RALPH ACT

159.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

160.    Plaintiffs are informed and believe that bias against plaintiffs' perceived political

affiliation with the protest against police violence and police racism, and bias against plaintiffs' perceived race, national origin, and/or religion, was a motivating reason for the defendants' above-described misconduct toward them.

161.    Defendants' above-described conduct violated plaintiffs' rights to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint, in violation of California Civil Code § 51.7.

162.    As a result of defendants' wrongful conduct, the plaintiffs suffered damages as alleged above.

163.    As a result of defendants' wrongful conduct, and the potential that such conduct will recur, the plaintiffs and class are entitled to relief from the potential that such violations will recur.

164.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT ELEVEN – ASSAULT AND BATTERY

165.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

166.    Defendants committed assault and battery on each of the plaintiffs, by shooting impact munitions at them and using chemical weapons and other force on them.

167.    Said acts by defendants and/or each of them were unreasonable and excessive uses of force.

168.    Plaintiffs did not consent to the use of force against them and were injured thereby.

169.    As a result of defendants' wrongful conduct, the plaintiffs suffered damages as alleged above.

170.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT TWELVE – FALSE ARREST AND FALSE IMPRISONMENT
## PLAINTIFF KIERRA BROWN against ALL DEFENDANTS.

171.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

172.    Plaintiff KIERRA BROWN and class members were arrested without reasonable

suspicion and without probable cause to believe that they had committed any crime.

173.    As a result of defendants' wrongful conduct, BROWN suffered damages as alleged above.

174.    As a result of defendants' wrongful conduct, and the potential that such conduct will recur, BROWN and the class are entitled to relief from the potential that such violations will recur.

175.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT THIRTEEN – NEGLIGENCE

176.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

177.    Defendants, and/or each of them, individually and/or while acting in concert with one another, owed plaintiffs the duty to use reasonable care to avoid causing foreseeable injury and damage to plaintiffs during the events described in this Complaint the above-described acts and omissions of defendants breached the duty of care defendants owed to plaintiffs.

178.    In doing the acts and/or omissions as alleged herein, Defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of plaintiffs' injuries and damages as alleged in this Complaint.

179.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## X. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1.    For an order certifying the class pursuant to Federal Rules of Civil Procedure 23(b)(2);

2.    For preliminary and permanent injunctive relief restraining defendants from engaging in the unlawful and unconstitutional actions complained of above;

3.    For a declaratory judgment that defendants' conduct complained of herein violated plaintiffs' rights under the Constitution and laws of the United States and California;

4.    For past, present and future general damages for the named individual plaintiffs, including but not limited to, pain, suffering, permanent disfigurement and/or emotional

distress to be determined according to proof;

5.      For past, present and future special damages for the named individual plaintiffs, including, but not limited to, medical expenses, lost wages, damage to career and/or other out of pocket losses to be determined according to proof;

6.      For punitive damages against the individual defendants and/or each of them, to be determined according to proof;

7.      For statutory damages and exemplary damages pursuant to Cal. Civil Code §§ 52 and 52.1, to be determined according to proof, and for a $25,000 civil penalty per violation pursuant to Cal. Civil Code § 52 for each plaintiff;

8.      For pre- and post-judgment interest as permitted by law;

9.      For attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52 and 52.1, and/or other authorities, to be determined according to proof;

10.     For costs of suit;

11.     For such other and further relief as the Court may deem just and proper.

## XI. CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

## XII. JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Dated: April 19, 2021       Respectfully submitted,
                            /S/ *Rachel Lederman*
                            Alexsis C. Beach & Rachel Lederman, Attorneys
                            Flynn Law Office
                            Attorneys for plaintiffs