UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JASMINE GAFFETT, et al.,

    Plaintiffs,

v.

CITY OF OAKLAND, et al.,

    Defendants.

Case No. 21-cv-02881-RS

**ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS**

## I. INTRODUCTION

Plaintiffs were injured by police while protesting police brutality last summer. They sued the unknown law enforcement officers who injured them, the Oakland Police Department and some of its leaders, and Alameda County and its Sheriff, Gregory Ahern. Alameda County and Sheriff Ahern move to dismiss. They argue Plaintiffs cannot show they will likely be injured again, or that the County can be held liable for its deputies' actions in this case. Neither of Defendants' arguments supply sufficient grounds to dismiss Plaintiffs' core claims. Plaintiffs adequately plead that Defendants' failure to train, for example, may give rise to liability. However, Defendants are correct that Plaintiffs have not averred enough facts for their conspiracy claim. Similarly, the Complaint contains no facts to explain how Defendants could have discriminated against Plaintiffs based on religion or national origin. For the reasons further set out below, Defendants' motion is denied, except that it is granted as to the conspiracy count and part of the Ralph Act count.

## II. BACKGROUND[1]

On May 29, 2020, several thousand protestors took to the streets of Oakland to demonstrate against police brutality and in support of Black Lives Matter. They were spurred to protest by the police officer killing of George Floyd in Minneapolis earlier that week. The protestors contend they faced the very same excessive force against which they were protesting. The Oakland Police Department had called in the Alameda County's Sheriff's Office as a mutual aid partner. Officers from both agencies formed a line across Broadway. Without giving the crowd a chance to disperse, they began firing impact munitions, explosive grenades, and chemical agents into the crowd. (Impact munitions are projectiles intended to be non-lethal, e.g., bean bag rounds, although they can cause serious injury and even death.) Plaintiff Jasmine Gaffett was near the front of the crowd when she was shot twice in the leg with impact munitions. Ms. Gaffett turned to run and was shot again with impact munitions, over and over—at least twenty shots hit the back of her body. She was severely injured: the police had broken her finger, she could barely move, and she was in considerable pain.

Three days later, a youth-led march for racial justice took place. At 5:00 PM, Oakland and Alameda County declared a curfew would take effect at 8:00 PM. The march had already begun before the curfew was announced. Plaintiff Toshua Sears was at the intersection of 8th and Broadway, before 8:00 PM, when law enforcement blocked three sides of the intersection. They then deployed chemical weapons, explosive grenades, and impact munitions. Mr. Sears did not hear any warning or order to disperse beforehand. As he tried to leave, he was hit by impact munitions and tear gas. He suffered pain and impaired vision thereafter.

The same night, Plaintiff Kierra Brown joined the demonstrators at 14th and Broadway,

---

[1] The factual background is based on the allegations in the first amended complaint, which must be taken as true for this motion. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Defendants seek judicial notice of facts such as how many Sheriff's deputies were at the protests relative to other agencies, and that Sheriff Ahern was the regional mutual aid coordinator. Judicial notice of these facts is inappropriate as they are not generally known, nor can they be determined from sources whose accuracy cannot reasonably be questioned. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citing Fed. R. Evid. 201(b)(1)). In any case, these facts would not affect the outcome here.

washing the eyes of teargassed protestors. Officers approached her "aggressively" and she ran towards 15th Street, believing this was what they wanted. An officer shot her with impact munitions, then arrested her, also before the curfew had taken effect. Ms. Brown has not regained full sensation in her leg and is at risk of losing mobility in her foot. No officer tried to intervene in these uses of force, nor did any officer provide first aid.

This case does not arise in a vacuum. Oakland P.D. remains under a negotiated settlement agreement relating to excessive force first entered in 2003. *Allen v. City of Oakland*, N.D. Cal. No. 3:00-cv-04599. Plaintiffs allege that despite this history, Oakland P.D. and the Alameda Sheriff's Office failed to provide adequate training on their policies and constitutional restrictions on use of force at protests. Oakland P.D. maintains policies on the use of force at protests: impact munitions may not be used for crowd control or dispersal. In a crowd, they may only be used against someone who poses an immediate threat of loss of life or serious injury. Even then, impact munitions should be used only when other means of arrest are unsafe and the officer has a clear shot, not when they may hit someone else. Chemical agents and hand thrown pyrotechnic devices may not be used in crowd events without the approval of the Incident Commander, absent exigent circumstances.

Plaintiffs allege Sheriff Ahern authorized the use of impact munitions without sufficient justification, resulting in such weapons being used unconstitutionally. None of this should surprise the leaders of Oakland P.D. and the Sheriff's Office, Plaintiffs argue. To the contrary, Sheriff Ahern told Oakland P.D. ahead of time that when providing mutual aid, his deputies would not comply with Oakland P.D.'s restrictions on the use of chemical agents and impact munitions. He communicated the same (possibly tacitly) to his deputies. This way, Oakland P.D. allowed the Sheriff's deputies to do its "dirty work," i.e., attack protestors because Oakland P.D. felt more constrained. To bolster their claims, Plaintiffs point to past demonstrations in which Sheriff's deputies used excessive force, and were supported by Sheriff Ahern. Plaintiffs also contextualize these events by noting the Alameda Sheriff's Office ranks third in the nation for wrongful deaths and excessive force payouts per officer.

In this suit, Plaintiffs aver the behavior at the protests at issue violated Oakland's own policies, the federal consent decree entered in *Allen*, common law duties, statutes, and the state and federal Constitutions. They seek injunctive relief, in the form of an order prohibiting Oakland P.D. and the Sheriff's Office from using certain weapons in crowds, and destroying Ms. Brown's arrest records. They also seek declaratory relief and damages. Plaintiffs plan to seek a class action but have not yet brought a motion for class certification. Plaintiffs amended their complaint in response to a previous motion to dismiss.

There are 12 counts in total, with two naming only the Oakland Defendants. Alameda County and Sheriff Ahern bring a motion to dismiss, and curiously include one of the two counts in which they are not named Defendants, the false arrest and imprisonment count. Def.'s Mot. To Dismiss at 14:22, Dkt. No. 32. They do not mention count eight, the Bane Act violation.

### III. LEGAL STANDARDS

Rule 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must contain a short and plain statement of the claim showing the pleader is entitled to relief. Fed. R. Civ. P. 8(a). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570, (2007)). A Rule 12(b)(6) motion tests the legal sufficiency of the claims alleged in the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Thus, dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged" under a cognizable legal theory. *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

A supervisor can be liable for a subordinate's violations if there is a sufficient causal

connection between his or her wrongful conduct and the constitutional violations, specifically through their (a) failure to stop actions they should have known would cause injury, (b) inaction in training or supervision, or (c) reckless indifference to others' rights. *Starr v. Baca*, 652 F.3d 1202, 1205-08 (9th Cir. 2011).

A local government can be held liable if a plaintiff can establish a policy or custom attributable to policymakers was the "moving force" behind the constitutional deprivation. *Monell v. Dep't. of Social Services of City of N.Y.*, 436 U.S. 658, 691–694 (1978). The Ninth Circuit recognizes three main theories of *Monell* liability: (1) an unconstitutional custom or policy behind the violation; (2) a deliberately indifferent omission, such as a failure to train; and (3) a final policy-maker's involvement in, or ratification of, the conduct underlying the violation of rights. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249–1250 (9th Cir. 2010).

## IV. DISCUSSION

### A. Responsibilities of Mutual Aid Agencies

Defendants frame an overriding issue: does a mutual aid agency need to abide by the requesting agency's policies and procedures? Defendants believe the answer is no, or at least that it is unclear, and this dooms Plaintiffs' case. The answer is indeed not clear. *See Anti Police-Terror Project, et al., v. City of Oakland, et al.*, No. 20-CV-03866-JCS 2020 WL 6381358, at *30 (N.D. Cal. Oct. 31, 2020) (arising from the same protests at issue here). Defendants also raise a policy argument: the answer must be no, because to hold otherwise would be unworkable and chill mutual aid by exposing agencies to liability for others' policies. Whatever dire consequences might ensue, Plaintiffs now insist they do not depend on this issue's resolution. To be fair, Defendants' reading of the Complaint is reasonable. At times, it seems like Plaintiffs are using the failure to follow Oakland's policies as a basis for their Complaint. However, Plaintiffs' current position is only intended to explain why the Sheriff's Office acted unconstitutionally. It is part of their factual narrative, they insist, not a purported basis for relief. Plaintiffs do not presume Oakland's policies create a private right of action, or that violating them is per se evidence of a constitutional violation.

### B. Sherriff Ahern's Liability

Defendants next argue the claims against Sheriff Ahern should be dismissed because Plaintiffs fail to show he was personally involved in the alleged violations. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Plaintiffs respond that all the law requires is a sufficient causal connection between his wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). A supervisor can be liable through their (a) failure to stop actions they should have known would cause injury, (b) inaction in training or supervision, or (c) reckless indifference to others' rights. *Id.* at 1205–08. Defendants claim Plaintiffs' averments—that Sheriff Ahern failed to intervene, failed to train adequately, and was deliberately indifferent—do not make out a claim for supervisory liability under *Starr*, but only a claim for municipal liability. This argument completely misses the mark. Plaintiffs' claims fit comfortably into the *Starr* framework.

Plaintiffs convincingly argue that when responding to a large event like the protests at issue, with a department-wide response, one can presume the agency's head was in control, or at the least ratifying his subordinates' actions. (*Citing Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 750 (N.D. Cal. 2020).) Defendants argue *Martinez* is distinguishable because the situation in that case involved the full attention of the police department. It beggars belief to state these protests also did not involve the full attention of the police department. These were epochal, headline-dominating protests about police brutality. In Oakland, they caused a state of emergency to be declared, as Defendants emphasize. It is hard to imagine a situation when it would be more implausible to state it did not have the full attention of the police. Moreover, a claim for failure to train or reckless indifference does not depend on the supervisor being in control. Under those theories, the lack of control itself is the sufficient causal connection between the supervisor and the violations.

Plaintiffs have pled plausibly that Sheriff Ahern was a cause of wrongful conduct. This is particularly true for the second protest: even if the first protest was a fluke no Sheriff could have prevented, the same behavior repeating itself days later suggests wrongful conduct under any of

1   the *Starr* categories. 652 F.3d at 1208.

### C. Counts One and Two: Injunctive and Declaratory Relief

Defendants argue Plaintiffs lack standing for injunctive relief because they cannot show the requisite sufficient likelihood they will be subject to excessive force again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). They argue the confluence of contingencies is too remote: there must be another protest, Plaintiffs must attend, Defendants must use excessive force, Plaintiffs must be injured. Unfortunately, one need look only to the motion for relating this case to others to see these cases are all too common. Dkt. No. 7. In their Complaint, Plaintiffs describe a pattern of excessive force at protests, and—again, unfortunately—there is a high chance there will be similar incidents to protest. It is uncertain whether Plaintiffs will be subject to excessive force again. Indeed, one can only hope they never even have to attend another protest of police brutality. Still, the likelihood is high enough that Plaintiffs have standing for an injunction, at least at this early point. *Lyons* is distinguishable: the chance of one person being put in an illegal chokehold is much lower than the chance of Plaintiffs being subject to excessive force at future demonstrations. 461 U.S. at 95. Defendants object that Plaintiffs have not protested again; Plaintiffs note they seek injunctive relief precisely because they do not feel safe protesting again without such relief.

Defendants move to dismiss the claim for declaratory relief because it would be superfluous of a grant of damages. They add that the declaration Plaintiffs seek is unclear, but even if it can be determined, it is unnecessary to clarify any legal issues. For their part, Plaintiffs note the existence of another adequate remedy does not preclude declaratory judgment. Fed. R. Civ. P. 57. They also frame the clash here as in part over whether Defendants' policies and practices are lawful. Defendants' assertion that no legal issues will require clarification through declaratory judgment seems correct. That said, for now, there is at least some uncertainty on this point, so declaratory relief cannot be dismissed at this stage.

### D. Count Six: Conspiracy

Several of Defendants' arguments against count six fail, but one succeeds. Count six is deficient because Plaintiffs have not averred adequate facts from which to infer the requisite

1    intent. Defendants argue Plaintiffs merely recite the elements of conspiracy without alleging the

2    unlawful purpose the conspiracy was for, or any specifics of the supposed conspiracy, e.g., the

3    time or place or persons involved. *Twombly*, 550 U.S. at 555. It is true, as Plaintiffs note, direct

4    evidence of conspiracy will rarely be available, even after discovery. Conspiracy is generally a

5    factual issue best left for the jury if it can be inferred, even if from only circumstantial evidence.

6    *Mendocino Envtl. Ctr.*, 192 F.3d at 1302.

7         The issue is Plaintiffs specifically aver only a conspiracy to violate Oakland P.D.'s

8    policies. As discussed above, they disavow this as the legal basis for their claim. Here, they view

9    this as evidence that Defendants also had an agreement to violate the Constitution. Even taking

10   Plaintiffs' averments as true, that would not be a reasonable inference for a jury to draw. The

11   Sheriff's deputies could have ignored Oakland's policies and still have followed the law easily.

12   For example, Oakland requires an Incident Commander to approve the use of chemical agents for

13   crowd control; Sheriff's deputies could use these agents constitutionally without seeking this

14   approval. It is plausible to infer they were negligent concerning the risk of excessive force; it is

15   implausible to infer they intended to break the law on these threadbare facts. *Twombly* requires

16   conspiracy allegations to be more specific and more plausible. 550 U.S. at 565, fn. 10.

17   Accordingly, this claim for relief must be dismissed with leave to amend.

18        If the conspiracy claim had enough factual support, Defendants' other arguments would

19   not defeat it. Defendants argue it is deficient because conspiracy itself is not a constitutional tort

20   under 42 U.S.C. § 1983. Plaintiffs must show there was an agreement to violate some

21   constitutional right, and the violation actually occurred. *Mendocino Envtl. Ctr. v. Mendocino*

22   *Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999). This point is somewhat confusing. Plaintiffs do not

23   allege conspiracy alone; they aver conspiracy to commit the other torts in their Complaint.

24        Alameda County also points to caselaw that it takes to mean it cannot possess the required

25   state of mind for a conspiracy. *E.g.*, *Scott v. Township of Bristol, et al.*, 1990 WL 178556, *6 (E.D.

United States District Court
Northern District of California

ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS
CASE NO. 21-cv-02881-RS

8

Pa. Nov. 14, 1990).[2] Plaintiffs distinguish the cases Defendants invoke as holding only that government entities cannot conspire with their own employees. This is known as the intracorporate conspiracy doctrine—and Plaintiffs rightly note it is unclear whether it even applies to § 1983 cases. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1868 (U.S. 2017). Plaintiffs argue a government entity is a person which can conspire under § 1983. Although they point to no direct authority so holding, a basic principle from *Monell* is that municipalities are persons for § 1983 purposes.

Defendants also object to Plaintiffs' claim that Sheriff Ahern "and/or" his agents communicated to Oakland P.D. that they would not comply with Oakland's policies. In their view, this vague, "shotgun" pleading makes it impossible for them to respond. The better reading of "and/or" is simply that Sheriff Ahern may have communicated to Oakland P.D. through his agents, and therefore does not create an unmanageable assertion.[3]

### E.  Count 7: Failure to Intervene

Law enforcement officers have a duty to intervene, if possible, when other officers violate constitutional rights, as Defendants acknowledge. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Defendants argue Plaintiffs have not adequately described the failure to intervene of any Defendants, even the unknown individual officers. They allege Plaintiffs have only recited the elements. Plaintiffs contend they have clearly pled a failure to intervene: they describe the violations happening in plain view of other officers, and note no officer intervened. They argue this is also proof of the government's failure to train and supervise. Plaintiffs are correct this claim is adequately pled. Failing to intervene is an omission: only its absence can be shown. How else

---

[2] They also rely on *Woodrum v. Woodward Cty.*, 866 F.2d 1121, 1126 (9th Cir. 1989), which does not discuss this at all.

[3] Defendants also nitpick various supposed flaws in Plaintiffs' conspiracy claim, e.g., they allege Sheriff Ahern has conspired "for years," but the conspiracy here arises out of protests in 2020. The two are logically consistent with an ongoing conspiracy or a series of conspiracies. Defendants also argue their purported lies to the media after the protests cannot be evidence of a conspiracy beforehand. This seems obviously incorrect. Actions taken after a conspiracy has achieved its goals can be evidence of its existence. A coverup is evidence of a crime, albeit weak evidence in this case. Anyway, these quibbles are somewhat frivolous, because they concern disputes over factual details which would not doom the claim at the pleading stage in any event.

could Plaintiffs plead no officer intervened? While some proof will eventually be required for this claim, e.g., videos or affidavits, for now this claim survives.

### F. Municipal Liability Claims

Defendants argue counts three, four, and at least one other count should be dismissed because they were not the "moving force" behind the violations.[4] *Monell*, 436 U.S. at 694. These counts involve violations of the First Amendment, and excessive force. Plaintiffs' main theory is a failure to train and supervise. Defendants insist Plaintiffs fail to allege any specifics. They bolster their argument by noting a municipality's culpability is most tenuous when the claim is for failure to train. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011). Under this theory, Defendants must be deliberately indifferent to the victims' rights. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Defendants frame this count as elevating Oakland's crowd control policy into a constitutional standard, as discussed above.

Plaintiffs argue they have adequately pled all bases of *Monell* liability, and their complaint makes out a plausible case that Defendants are the moving force behind the constitutional deprivations. Specifically, Sherriff Ahern's authorization of his deputies to use impact munitions, without sufficient justification, would be enough. Beyond that, the repeated violations by the Sheriff's Department evidence both a ratification of unconstitutional customs and a failure to train to prevent these customs. In other words, for the second protest in particular, the Alameda Defendants bear at least some responsibility, not only individual officers. These are adequately pled to have been the moving force behind the violations.

### G. Count Nine: Ralph Act

Count nine claims a violation of the Ralph Act, California Civil Code § 51.7.[5] The

---

[4] Defendants refer to the third count they discuss in this section as count seven, conspiracy. Conspiracy is count six, and Plaintiffs discuss count seven, failure to intervene, elsewhere in their brief too. Plaintiffs assert Defendants are liable for count eight under *respondeat superior*, which Defendants do not mention in their motion or reply. Plaintiffs share some responsibility for the confusion, as Plaintiffs mistakenly repeat "Count 11" to label Count 12 in their complaint.

[5] Defendants mistakenly refer to this as count 10 instead of count nine.

ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS
CASE NO. 21-cv-02881-RS
10

elements include that the defendant was motivated by his or her perception of plaintiff's political affiliation or protected characteristics. *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 880–81 (2007). Plaintiffs contend the officers targeted some in the crowd because of their race, and some because of their religion; seemingly on the surface inconsistent with officers targeting them because of their political affiliation or other characteristics. Plaintiffs explain in response that they were targeted for multiple reasons. There are few facts identified for the targeting, but the lack of motive for instigating violence makes it a plausible inference, which must be drawn in favor of Plaintiffs as the non-moving party. On the other hand, Plaintiffs offer no pleaded facts that any Defendant could have known of any Plaintiff's national origin or religion. There are no allegations of visible markers of these characteristics at the protest, or that Plaintiffs communicated about them to Defendants. Thus, Defendants' motion to dismiss is granted as to the portion of the Ralph Act claim based on religion and national origin, with leave to amend.

### H. Counts 8 and 10-12: Common Law-Type Claims and Bane Act

Defendants argue Plaintiffs have not provided a statutory basis for the counts of assault and negligence. Cal. Gov. Code § 815; *Susman v. City of Los Angeles*, 269 Cal. App. 2d 803, 808–09 (1969). These counts are at root based on common law. Plaintiffs need not, however, cite state law codifying common law torts and outlining defenses. The key issue is whether they have offered enough facts to make out the claim, which they have. Additionally, Plaintiffs note they cited Cal. Gov. Code § 910, when discussing their compliance with the California Tort Claims Act.

Defendants' attack on two additional counts merit no extended discussion here. Defendants move to dismiss count 11, the false arrest claim, but it is one of the two counts not asserted against them. (The other is count five, for wrongful arrest.) Also, Plaintiffs assume Defendants challenge count eight, the Bane Act claim, on the grounds they have not stated the statutory basis for liability. Yet, it is unclear whether Defendants challenge this claim at all.

## V. CONCLUSION

For the reasons set out above, Defendants' motion is denied except as to the conspiracy

ORDER DENYING IN PART AND GRANTING IN PART MOTION TO DISMISS
CASE NO. 21-cv-02881-RS

11

claim and the part of the Ralph Act claim for discrimination based on national origin and religion; those parts of the motion are granted. Should Plaintiffs elect to file a further amended complaint on the claims identified in this order, they must do so within 21 days of this date.

**IT IS SO ORDERED**.

Dated: October 1, 2021



RICHARD SEEBORG
Chief United States District Judge