RACHEL LEDERMAN, SBN 130192
Alexsis C. Beach & Rachel Lederman, Attorneys
P.O. Box 40339
San Francisco, CA 94140-0339
(415) 282-9300; fax (510) 590-9296
rachel@bllaw.info

R. MICHAEL FLYNN, SBN 258732
Flynn Law Office
1720 Broadway, Suite 430
Oakland, California 94612
Phone: (510) 893-3226, fax: (866) 728-7879
michael@flo-law.com

Attorneys for plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASMINE GAFFETT, KIERRA BROWN, and TOSHUA SEARS, Individually and on behalf of a class of all persons similarly situated,<br><br>  v.<br><br>CITY OF OAKLAND, SUSAN MANHEIMER, LERONNE ARMSTRONG, RONALD HOLMGREN, RANDELL WINGATE, ALAMEDA COUNTY, GREGORY J. AHERN, DOES 3-100. | Case 3:21-cv-02881-RS<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**<br><br> **42 U.S.C. § 1983**<br><br>**JURY TRIAL DEMANDED** |

## I.      INTRODUCTION

1.      Police have been targeting, brutalizing, and killing Black people since the inception of law enforcement in the United States, and Oakland's police force has shown a demonstrable

history of violence against Black people and other people of color in Oakland. This action arises out of protests across the nation in response to the May 25, 2020, murder of George Floyd by Minneapolis Police Department officers. The events in Minneapolis, soon after the deaths of Breonna Taylor and Ahmaud Arbery, brought out millions of people around the country to condemn the deaths of Black and Brown people by law enforcement in one of the largest social justice movements in the United States history.[1]

2.      In Oakland, thousands took to the streets on a daily basis starting on May 29, 2020, to make their viewpoint known that police brutality and institutionalized racism must end. The Oakland Police Department ("OPD"), and its mutual aid partner Alameda County Sheriff Office ("ACSO"), brutally repressed the Oakland demonstrators, targeting protestors with highly dangerous impact munitions (also known as Specialty Impact Munitions "SIM", Kinetic Impact Projectiles "KIP", or Projectile Impact Weapons "PIW"), explosive grenades and chemical agents, and wrongful arrests.

3.      This misconduct by OPD and ACSO violated the plaintiffs' constitutional rights, and the CITY OF OAKLAND Police Department's own Crowd Control and Crowd Management Policy. Said Policy was adopted by the CITY OF OAKLAND and OPD as part of the federal court settlement orders in four prior federal lawsuits arising from mass injuries caused by OPD's and assisting agencies' (including ACSO's) constitutional violations, including misuse of these weapons and wrongful mass arrests at demonstrations: *Coles / Local 10, ILWU v. City of Oakland*, Nos. C03-2961 TEH, C03-2962 TEH; *Spalding, et al. v. City of Oakland*,

---

[1] *Black Lives Matter May Be the Largest Movement in U.S. History*, NY Times, 3 Jul. 2020 https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html, last visited Feb. 2021.

C11-02867 TEH, and *Campbell, et al. v. City of Oakland*, C11-05498 JST. (See Exhibit A, OPD Training Bulletin III-G, which is the Crowd Control and Crowd Management Policy as promulgated to the police force.)

4.      This is a civil rights action for damages, injunctive and declaratory relief arising from the unconstitutional OPD and ACSO violence toward demonstrators on May 29 and June 1, 2020.

## II. JURISDICTION AND VENUE

5.      This action seeks damages and injunctive relief under 42 U.S.C. § 1983.  This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 and 1343. It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

6.      Venue properly lies within this District under 28 U.S.C. § 1391(b). The named defendants perform their official duties in this District, and the events and omissions giving rise to plaintiffs' claims occurred in this District.

7.      Plaintiffs JASMINE GAFFETT, KIERRA BROWN and TOSHUA SEARS have filed administrative claims with the City of Oakland and with Alameda County, in compliance with California Government Code § 910 et seq. The City of Oakland denied plaintiffs' claim on February 1, 2021. More than 45 days have elapsed since the claim against Alameda County was submitted on October 16, 2020; therefore that claim is deemed denied.

## III. INTRADISTRICT ASSIGNMENT

8.      Pursuant to Local Rule 3-2(e), this action is properly assigned to the Oakland or San Francisco divisions of this Court.

## IV. PARTIES

### A. PLAINTIFFS

9.      Plaintiff JASMINE GAFFETT is an adult resident of Alameda County, California.

10.     Plaintiff KIERRA BROWN is an adult resident of Contra Costa County, California.

11.     Plaintiff TOSHUA SEARS is an adult resident of Alameda County, California.

**B. DEFENDANTS**

12.     Defendant CITY OF OAKLAND is a municipal corporation, duly organized and existing under the laws of the State of California.

13.     Defendant SUSAN MANHEIMER was at all times relevant herein, employed by defendant City of Oakland as the Interim Chief of Police, and was acting within the course and scope of that employment at all such times. At all material times, defendant MANHEIMER was the final policy making official for the Oakland Police Department (OPD), ultimately responsible for all policies, procedures or omission of procedures, supervision, and training of OPD employees and for supervision of assisting agencies brought in as mutual aid to OPD during Oakland events.

14.     Defendant LERONNE ARMSTRONG is employed by defendant City of Oakland as its current Chief of Police, and was at all times relevant herein, its Deputy Chief of Police, and was acting within the course and scope of that employment at all such times. At all material times, defendant ARMSTRONG, as the Incident Commander, supervised the response to the June 1, 2020, demonstration by the CITY OF OAKLAND Police and the assisting agencies brought in as mutual aid to OPD.

15.     Defendant RONALD HOLMGREN is and was at all times relevant herein, employed by defendant City of Oakland as its Deputy Chief of Police, and was acting within the course and scope of that employment at all such times. At all material times, defendant HOLMGREN, as

the Incident Commander, supervised the response to the May 29, 2020, demonstration by the CITY OF OAKLAND Police and the assisting agencies brought in as mutual aid to OPD.

16.     Defendant RANDELL WINGATE is and was at all times relevant herein, employed by defendant City of Oakland as its Captain of Police, and was acting within the course and scope of that employment at all such times. At all material times, defendant WINGATE, as the Operations Chief, supervised the response to the May 29, and June 1, 2020, demonstrations by the CITY OF OAKLAND Police and the assisting agencies brought in as mutual aid to OPD.

17.     Defendant ALAMEDA COUNTY is a political and administrative subdivision of the State of California.

18.     Defendant GREGORY J. AHERN is, and was at all times relevant herein, the elected Sheriff and Coroner of Alameda County, and the regional commander of mutual aid. Defendant AHERN supervises the Alameda County Sheriff's Office (ACSO) and all its personnel. At all material times, defendant AHERN was the final policy making official for the ACSO, ultimately responsible for all policies, procedures or omission of procedures, supervision, and training of ACSO employees. AHERN is also, and was at all material times, the Law Enforcement Mutual Aid Coordinator for Region II, which includes Oakland, directing the response of all regional agencies to requests for mutual aid from the City of Oakland and its Police Department.

19.     The individual defendants are sued in their individual capacities.

20.     The DOE defendants include other individuals who supervised and/or participated in the conduct complained of herein. Plaintiffs are informed and believe and therefore allege that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants proximately caused said

incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

21.     In doing the acts alleged herein, defendants, and each of them, acted within the course and scope of their employment.

22.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under color of law.

23.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted as the agent, servant, employee and/or in concert with each of said other defendants.

## V. FACTS

24.     On May 25, 2020, Minneapolis police officers killed George Floyd, a 46-year-old Black Minneapolis resident. A white police officer knelt on Mr. Floyd's neck for nearly nine minutes while three other officers observed. Mr. Floyd died calling out for his mother and begging for his life as his death was recorded by passersby. The recording was shared on multiple media platforms for all the world to witness.

25.     In the days and weeks following Mr. Floyd's death, people across the country flooded into streets demanding an end to police brutality against Black people; protesting the deaths of Mr. Floyd, Breonna Taylor, Ahmaud Arbery, and countless others at the hands of police, through vigils, demonstrations, and public gatherings.

26.     OPD Command Staff, including defendants MANHEIMER, ARMSTRONG, and HOLMGREN, were aware of the potential for large demonstrations to occur in Oakland as the weekend drew near, and eventually that a demonstration had been called for that Friday evening, May 29. They planned for the May 29 demonstration, including by calling in mutual aid through the Regional Mutual Aid Coordinator, defendant AHERN and ACSO.

27.     Also in anticipation of the Oakland protest organized for the evening of May 29, 2020, earlier that day, attorneys of record for plaintiffs in the prior crowd control settlements emailed defendants MANHEIMER, ARMSTRONG and HOLMGREN, along with Assistant Chief Darren Allison, Mayor Libby Schaaf, and City Attorney Barbara Parker to remind them of the City of Oakland's and the OPD's legal obligation to comply with the OPD Crowd Management and Crowd Control Policy in policing anticipated demonstrations (Exhibit B, May 29, 2020, Letter).

28.     Specifically, the May 29, 2020 Letter reminded OPD and CITY OF OAKLAND officials that the federal court settlement agreements and orders in *Spalding, et al. v. City of Oakland*, C11-02867, and *Campbell, et al. v. City of Oakland*, C11-05498, mandate adherence to the Crowd Control Policy, promulgated as OPD Training Bulletin III-G, in all crowd situations, and require OPD and the City to meet and confer with plaintiffs' counsel before making any material change to TB III-G and associated training outlines. (Exhibits A and B.)

29.     The May 29, 2020 Letter specifically mentioned that the Policy prohibits certain weapons and types of force in the crowd context and restricts others. Chemical agents and hand thrown pyrotechnic devices may not be used in crowd events without the approval of the Incident Commander, absent exigent circumstances. (Exhibit A, ¶ V.H.4, p. 13, and Exhibit B.) Hand thrown pyrotechnic devices such as CS Blast grenades may not be thrown directly into a

crowd. They must be deployed to explode at a safe distance from the crowd to minimize the risk of serious injury. (Exhibit A, ¶ V.H.5, p. 14, and Exhibit B.) The May 29, 2020 Letter also mentioned that these devices have caused serious burns and permanent hearing loss when used in Oakland crowds. (Exhibit B.)

30.     The May 29, 2020 Letter specified that, according to Oakland's own policy, "Specialty Impact Less-Lethal Munitions (SIM) such as so called "foam" or "sponge" rounds and bean bags may *never* be used for crowd control or dispersal. In a crowd situation, the Policy requires a different standard for SIM than on patrol. SIM may only be used against a specific individual who is engaging in conduct that poses an *immediate threat of loss of life or serious bodily injury* to him or herself, officers, or the general public or who is engaging in substantial destruction of property which creates an *immediate risk to the lives or safety* of other persons. In such instances, SIM shall be used *only* when other means of arrest are unsafe and when the individual can be targeted without endangering other crowd members or bystanders, i.e., when the officer has a clear shot – not in the midst of a crowd. (Exhibit A, ¶ VI.F.2, p. 15 and Exhibit B.)

31.     An OPD Chief's Memorandum to all personnel further clarifies OPD's policy regarding use of SIM at crowd events, stating: "*The mere fact that an individual is picking up, about to throw, or throwing a chemical agent canister previously deployed by OPD, or other object, does not automatically constitute an immediate threat of loss of life or serious bodily injury. Members must consider the size and composition of the object and the distance from which it is being thrown*." (Exhibit C, Chief's Nov. 19, 2014 Memo.)

32.     The Chief's Memorandum goes on to clarify that "*Even when an individual's conduct does constitute an immediate threat of loss of life or serious bodily injury, Direct Fired SIM*

*shall be used only when other means of arrest are unsafe and when the individual can be targeted without endangering other crowd members or bystanders. The member using SIM must have a shot the member reasonably believes can be taken and will only impact the intended target, given consideration of how close the individual is to others, whether crowd members are moving, and factors that may affect visibility and the accuracy of shot placement, such as chemical agent deployment*." (Exhibit C.)

33.     The Chief's Memorandum also states that "*Medical attention shall be provided to any individual struck by SIM. All officers at the scene are responsible for ensuring that medical attention is available for injured persons and for people affected by chemical agents.*" (Exhibit C.)

34.     OPD and the City adopted these restrictions to prevent another tragedy like the permanent brain damage sustained by Scott Olsen, a young veteran who was accidentally struck in the head with a police "bean bag" while peacefully standing at a 2011 demonstration. Mr. Olsen received a $4.5 million settlement from the City, but will never regain full mental function."[2]

35.     It is well recognized that impact munitions or SIM, also known as KIP or PIW, can cause injuries ranging from localized contusions to severe organ damage and death. Data from 1,984 SIM injuries revealed that 3% died and 15.5% were permanently disabled as a result of being shot with SIM.[3]

_____

[2]*Olsen v. City of Oakland*, No. C12-6333 SI; https://www.sfgate.com/crime/article/Occupy-protester-wounded-by-Oakland-police-gets-5337743.php.

[3] Haar RJ, Iacopino V, Ranadive N, et al. *Death, injury and disability from kinetic impact projectiles in crowd-control settings: a systematic review.* BMJ Open 2017;7:e018154.

36.     Indeed, close-range firing of SIM/ KIP results in injury patterns similar to those seen with live ammunition, causing severe injuries and disabilities. It is important to note that while factors such as a large surface area may reduce the risk of skin penetration, they increase the inaccuracy of the weapon. SIMs/ KIPs, therefore, are not only likely to be lethal at close range, but are likely to be inaccurate and indiscriminate at longer ranges, even those recommended by manufacturers for safety.[4] Following an extensive review of the medical literature, Physicians for Human Rights made findings consistent with OPD's prohibition on using SIM for crowd control:

> The classification of KIPs as "less-lethal" contradicts extensive research illustrating that these weapons can cause serious injuries, permanent disabilities, and death. Severe injuries are more likely when KIPs are fired at close range, as some types of KIPs have the same ability to penetrate the skin as conventional live ammunition and can be just as lethal. When launched or fired from afar, these weapons are often inaccurate and can strike vulnerable body parts, causing unintended injuries to bystanders. Therefore, PHR considers that *KIPs are not an appropriate weapon for crowd management and specifically for dispersal purposes*. PHR thus recommends that localities move to ban their use altogether in crowd-control situations, due to the egregious and life-threatening injuries they can cause, particularly given their *inherently indiscriminate nature in crowd-control situations*.[5]

---

doi:10.1136/bmjopen-2017-018154; <*https://bmjopen.bmj.com › bmjopen › 7 › e018154.full.pdf*>, accessed Oct. 17, 2021, pp. 2-5.
[4] Physicians for Human Rights and INCLO *Lethal in Disguise: The Health Impacts of Crowd-Control Weapons* (2016) https://www.inclo.net/issues/lethal-in-disguise/ accessed Oct. 17, 2021.

[5] Physicians for Human Rights, *Shot in the Head*, Sept. 14, 2020, https://storymaps.arcgis.com/stories/29cbf2e87b914dbaabdec2f3d350839e accessed Oct. 17, 2021, emphasis added.

37.     Impact munitions caused at least 115 head injuries across the United States during the summer 2020 protests following the killing of George Floyd.[6]

38.     In addition to the provisions mentioned in the May 29, 2020, letter, the Oakland Crowd Control Policy and OPD Training Bulletin III-G govern OPD's use of mutual aid at a demonstration or crowd event. They provide, inter alia,

> …[T]he [Incident Commander] shall be responsible for ensuring to the extent possible that mutual aid agencies:
>
> 1.  Are briefed and in agreement with OPD's Unity of Command structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control and dispersal;
> 2.  Are briefed on OPD's policy on prohibited weapons and force;
> 3.  Do not bring or use any weapons or force that is prohibited under OPD's policy;
> 4.  Are provided a copy of OPD's Crowd Control Policy and Use of Force policies;
> 5.  Are not assigned to front-line positions or used for crowd intervention, control or dispersal unless there is a public safety emergency….
>
> (Exhibit A, ¶ IX, pp. 20-21.)

39.     The above provisions regarding mutual aid were added to the OPD Policy in 2013 as part of the aforementioned *Spalding* and *Campbell* settlement agreements, after mutual aid agencies such as ACSO caused many injuries through their use of SIM and hand-thrown pyrotechnic grenades in a manner prohibited by Oakland's Policy during the Occupy Oakland demonstrations in 2011-2012. Following widescale public outcry over the law enforcement excessive force at those demonstrations, OPD asked Sheriff AHERN and ACSO to seek

---

[6] Physicians for Human Rights, *Shot in the Head*, Sept. 14, 2020, https://storymaps.arcgis.com/stories/29cbf2e87b914dbaabdec2f3d350839e accessed Oct. 17, 2021.

assistance for OPD from agencies with similar policies, but AHERN publicly stated that departments called in to provide emergency assistance would follow their own use-of-force policies and be armed with weapons prohibited by Oakland's policy. In effect, Defendant AHERN and ALAMEDA COUNTY were condoning the use of indiscriminate, unconstitutionally excessive force on protesters, with the acquiescence of OPD and the CITY OF OAKLAND.[7]

40.    The City of Oakland had the Frazier Group conduct an independent investigation of the police response to Occupy Oakland, and adopted its report, findings and recommendations. These included, inter alia, that Mutual Aid officers should not be comingled with OPD officers on the front lines, "even under extreme conditions", but rather, assigned specific missions to be carried out with department and unit integrity under the direction of OPD. (Frazier Report, June 14, 2012, p. 13.)

41.    However, even after the provisions concerning mutual aid were added to the OPD Crowd Control Policy by agreement and federal court order, ACSO continued to communicate to Oakland Police Department command staff that ACSO would not comply with the OPD Crowd Control Policy when providing mutual aid in Oakland. SHERIFF AHERN and/or his agents communicated that ACSO personnel would not comply with the Policy's restrictions on use of chemical agents and less lethal munitions; would use chemical agents and less lethal munitions without the authorization of OPD Commanders; and would bring and use weapons and force that are prohibited under OPD's policy while providing mutual aid in Oakland. The

-----

[7]Shoshana Walter, NY Times, *In Oakland, Officials Say Police Used Illegal Tactics* (Apr. 28, 2012) https://www.nytimes.com/2012/04/29/us/oakland-police-say-theyve-altered-tactics-for-handling-protests-in-oakland-officials-say-police-used-illegal-tactics.html Accessed Oct. 19, 2021.

OPD defendants tacitly or explicitly agreed, flouting the federal court settlement agreements and orders in *Spalding* and *Campbell* by continuing to put ACSO and other mutual aid officers on the front lines in contact with demonstrators and crowds, and allowing them to use dangerous weapons and excessive force against crowds which included lawful demonstrators, journalists, observers and bystanders, and thus violate individuals' constitutional rights.

### The May 29 Oakland Demonstration: Jasmine Gaffett

42.     At about 8 p.m. on May 29, 2020, demonstrators assembled at Broadway and 14th Street in Oakland to express their views regarding the policing system that has systematically killed Black people and other people of color. Other participants came with medical supplies, water, and other aid for the demonstrators. And others, including journalists, legal observers, and passersby, simply observed the demonstration. Most of the demonstrators and observers wore masks and observed social distancing.

43.     The defendants would ultimately inflict the same sort of ruthless violence on the demonstrators that the demonstrators were protesting, and that is prohibited by the OPD Crowd Control and Crowd Management Policy: indiscriminately dispersing teargas and shooting impact munitions into the crowd, and detonating explosive grenades to cause panic and disorientation. (See Exhibit A.)

44.     Defendant RONALD HOLMGREN was the Incident Commander, and Defendant RANDELL WINGATE was the Operations Chief, who planned, commanded and supervised the OPD and mutual aid officers' response to the May 29, 2020, demonstration.

45.     On May 29, 2020, plaintiff Jasmine Gaffett attended the demonstration in downtown Oakland to express her opposition to racist police violence and support for the Black Lives Matter movement.

46.     Some time after 9pm, OPD and ACSO officers, formed a line across Broadway near 7th Street in which officers from both departments were comingled on the front line -- exactly as the City of Oakland's own Frazier Report had found should not be done.

47.     Despite the fact that the crowd was largely peaceful, OPD declared the demonstration an unlawful assembly, without lawful basis. At the *same time*, the OPD and ACSO officers began using CS Blast grenades and Stinger Grenades, and teargas, such that the crowd did not have a chance to disperse in compliance with the order before being subjected to the chemical agents and volley of small explosives -- which is explicitly prohibited by the OPD Policy. (Exhibit A, ¶ V.H.4.e, V.H.5.c, p. 14.) They also began shooting impact munitions into the crowd -- which is also explicitly prohibited by the OPD Policy. (Exhibit A, ¶ VI.F.2, p. 15: "*Direct Fired SIM may never be used indiscriminately against a crowd or group of persons even if some members of the crowd or group are violent or disruptive.*")

48.     Plaintiff Gaffett stood near the front of the crowd, closest to the police line, wearing a red bandanna. She chanted and expressed views critical of the police and their response to the demonstration. Ms. Gaffett and the rest of the crowd retreated when the police began teargassing and shooting, but when the chemical agent cleared, they came back to continue demonstrating against police violence.

49.     Ms. Gaffett, and others near her, were yelling at the police and telling them that what they were doing was wrong, but neither Ms. Gaffett, nor anyone near her, were throwing anything, physically or verbally threatening the police, or trying to breach the police line.

50.     Then, without warning, DOE OPD and/or ACSO officers shot Ms. Gaffett twice in the leg, in quick succession, with impact munitions. Ms. Gaffett turned around and tried to run away from the police, but the DOE officers aimed at her and deliberately shot her again and



again, while she fled. DOE OPD and/or ACSO defendants shot Ms. Gaffett a total of at least twenty times, all over her body. After the first two shots, the DOE defendants kept shooting Ms. Gaffett from behind as she ran from them.

51.     Ms. Gaffett never presented any threat whatsoever to any of the OPD or ACSO officers or to anyone else. There was no justification for the defendants to use any force on her, and thus the twenty-plus shots with highly dangerous impact munitions were completely unnecessary and unlawful.

52.     Ms. Gaffett finally escaped further fire by lying on the ground behind a utility box. No OPD or ACSO officer offered her any first aid or summoned medical aid for her despite the fact that the shooting occurred in full view of the entire line of OPD and ACSO officers. This, too, violated the OPD Policy. (Exhibit A, ¶ VI.F.2.c, p. 15: "*Any person struck by a round shall be transported to a hospital for observation and any necessary treatment. Ambulance service, if required, shall be ordered per Department General Order I-4, AMBULANCE SERVICE. First aid, when necessary, shall be administered per Training Bulletin III-K, FIRST AID.*")

53.     A nurse who was acting as a medic for injured demonstrators gave Ms. Gaffett aid, and she was eventually able to get home.

54.     Ms. Gaffett was covered with large welts. Among other places, she was hit close to her spleen, kidneys, spine, and groin, and in her right ring finger.

55.     The OPD Crowd Control Policy prohibits officers from discharging SIM at a person's left armpit, spine, kidneys, or groin unless deadly force would be justified. (Exhibit A, ¶ VI.F.2.h, p. 16.)

56.     In severe pain, Ms. Gaffett could barely move for two days, requiring assistance for the most basic functions. She remained laid up at home, in pain, for two weeks, but because she had been laid off due to the pandemic and had no health insurance, she did not immediately seek healthcare.

57.     When Ms. Gaffett was seen at a clinic two weeks after being shot she still had visible ecchymosis with hard, swollen lumps, and her right ring finger was found to be fractured.

### The June 1 Oakland Demonstration: Toshua Sears and Kierra Brown

58.     On June 1, 2020, young people including many Black and Brown high school students and others held a march to protest racist police violence. The march started at Oakland Technical High School, and was planned to end with speeches at the Oakland Police Administration Building. At the onset, the organizers announced that the protest was peaceful and explicitly called for "no destruction."

59.     Despite the fact that the march was peaceful, Alameda County declared an 8pm curfew. Also, on June 1, 2020, the City of Oakland declared a local emergency and 8 p.m. to 5 a.m. curfew.

60.     Defendant LERONNE ARMSTRONG was the Incident Commander, and Defendant RANDELL WINGATE was the Operations Chief, who planned, commanded and supervised the OPD and mutual aid officers' response to the June 1, 2020, demonstration.

61.     Well prior to the curfew hour, Oakland and Alameda County officers formed lines blocking the demonstrators' path, forcing many of them to stop at Oscar Grant / Frank Ogawa Plaza rather than at the Police Administration Building.

62.     At approximately 5 p.m., after the march had already started, the County of Alameda and the City of Oakland began disseminating the message that a curfew would begin just three hours later.

63.     A smaller number of demonstrators continued from Oscar Grant Plaza towards the Police Administration Building. At Washington Street and 8th Street, the demonstrators met a line of police outfitted in full riot gear. The OPD 'kettled' the group via line formations and by way of their vehicles, blocking opportunities for egress.

64.     Without warning and before the curfew hour, the OPD and ACSO used chemical weapons, threw explosive blast grenades and pyrotechnic devices, and shot impact munitions into the crowd of confined demonstrators, causing chaos. A dispersal announcement that many or most of the crowd could not hear or decipher was made a couple of seconds prior to the bombardment of chemical weapons, impact munitions and blast grenades.  The police filled the entire block between 8th and 9th St. with a virtual wall of CS gas and smoke that impeded, rather than aided the demonstrators in dispersing as people had difficulty seeing and breathing, and impacted neighboring residents and business in this dense urban area of downtown Oakland.

65.     Plaintiffs KIERRA BROWN and TOSHUA SEARS each attended the June 1, 2020, march to protest racist police violence. Mr. Sears, who is Black, carried a sign, "All lives matter even ours".

66.     TOSHUA SEARS was in the area of 8th and Broadway, when well before 8pm, DOE OAKLAND Police and ALAMEDA COUNTY Sheriff officers blocked egress on three sides and



at about 7:40pm, without warning, DOE OAKLAND and ALAMEDA COUNTY officers threw and shot chemical weapons, explosive grenades and SIM into the crowd. The crowd had been peaceful, and Mr. Sears did not hear the police give any warnings, orders or announcements, nor did he see any crowd activity that would justify the sudden use of force. Mr. Sears began to leave, when suddenly, he felt an enormous impact as a DOE OAKLAND Police or ALAMEDA COUNTY Sheriff officer shot him with an impact projectile in the right hip / buttock area.

67.     At first, Mr. Sears did not know if he had been shot with a live bullet or a so-called less lethal impact munition. It was terrifying. Chemical agent burned Mr. Sears' eyes, mouth and nose. It was hard to see and breathe. He hobbled away as best he could and called his wife to pick him up.

68.     At home, Mr. Sears washed his face and flushed his eyes out but his eyes swelled and remained swollen for days. His vision was affected as a result of chemical conjunctivitis caused by his exposure to the chemical agent. His hip remained extremely painful and developed a large, hard, swollen lump. It was hard to read or walk for some time. He could not sleep on his side. The lump and pain persisted for months.

69.     Mr. Sears never presented any threat whatsoever to any of the OPD or ACSO officers or to anyone else. There was no justification for the defendants to use any force on him, and thus both the shot and teargas were completely unnecessary and unlawful.

70.     Many other demonstrators were shot in the back as they were fleeing the shooting, explosive grenades and chemical weapons, only to be impeded by police lines kettling them from all directions.

71.     Public health and other medical experts have condemned the use of teargas and other respiratory irritants on protesters as increasing the risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing, as well as by forcing those exposed to remove masks that have been contaminated.

72.     KIERRA BROWN was not at 8th and Broadway when the police used the chemical weapons, but went to 14th and Broadway after the march to help wash people's eyes who had been affected by the chemical agent. While Ms. Brown was doing this, the police approached and pushed the crowd further up Broadway. Ms. Brown was running toward 15th Street, which was what it seemed the police wanted the crowd to do, when a DOE OAKLAND or ALAMEDA COUNTY Sheriff officer shot her in the back of her right leg.

73.     The OAKLAND and ALAMEDA COUNTY officers then trapped Ms. Brown and others between their lines and detained them, zip tying Ms. Brown and the others' hands. The kettling occurred before 8pm.

74.     DOE OAKLAND Police officers took Ms. Brown to a parking garage for processing before ultimately releasing her with a citation. She was never charged with any crime.

75.     Ms. Brown never presented any threat whatsoever to any of the OPD or ACSO officers or to anyone else. There was no justification for the defendants to use any force on her, and thus shooting her with highly dangerous SIM as she attempted to flee in response to the police action was completely unnecessary and unlawful.

76.     There was no probable cause to arrest Ms. Brown.

77.     That night, Ms. Brown's leg swelled and became numb from hip to ankle. She

experienced uncomfortable tingling, and her leg developed a hard, swollen lump.

78.     Ms. Brown has never regained full sensation in her right leg and is at risk of losing

mobility in her foot as a result of being shot by the DOE OPD or ACSO officer.



79.     Ms. Gaffett, Ms. Brown and Mr. Sears wish to continue to express their views on police

brutality and institutionalized racism by participating in public protests on the streets of Oakland,

but are afraid that they will again be subjected to unlawful law enforcement violence and

wrongful arrests.

80.     Defendants' actions on May 29 and June 1 violated every provision of the CITY OF

OAKLAND's Crowd Management and Crowd Control Policy that the attorneys had warned

about in their May 29 letter, and more. Oakland's own policy and the law are clear that verbal

criticism or abuse of officers is not grounds for arrest or use of force. And while police may use

force to defend themselves against an individual, it is both illegal and a violation of Oakland's

policy to use impact munitions indiscriminately against a crowd.

81.      Defendants' actions on May 29 and June 1 violated the Policy's provisions which

prohibit impact munitions and explosive grenades from being fired into crowds, and allow

impact munitions to be used *only* against "a specific individual who is engaging in conduct that poses an immediate threat of loss of life or serious bodily injury to him or herself, officers, or the general public or who is engaging in substantial destruction of property which creates an immediate risk to the lives or safety of other persons" (Ex. A, ¶ VI.F.2.a, p. 15); provisions limiting the use of chemical weapons (Ex. A, ¶¶ V.H.4, V.H.5, pp. 13-14); and the requirement that OPD ensure mutual aid agencies do not bring or use any weapons or force that is prohibited under this policy, and not be assigned to front-line positions unless there is a public safety emergency (Ex. A, ¶ IX, p. 20). ACSO brought and used prohibited weapons including Stinger Grenades at the May 29 and June 1 events, violating Oakland's Policy, ¶ IX.3, and ACSO officers, including the DOE ACSO defendants, were comingled with OPD in front-line positions, violating ¶ IX.5 and the City of Oakland's Frazier Report findings.

82.     On May 29 and June 1, defendants also violated the Crowd Control Policy provision providing that "Any person struck by a round shall be transported to a hospital for observation and any necessary treatment." (Exhibit A, ¶ VI.F.2.c, p. 15.) None of the plaintiffs were offered medical aid by OPD or City of Oakland personnel (or by ACSO personnel).

83.     Following the May 29 – June 1 demonstrations, CITY OF OAKLAND officials made a number of false and misleading statements to the public and media about the demonstrations and the actions of OAKLAND police officers and mutual aid agencies, fabricating and/or exaggerating reports of property destruction and supposed aggression by demonstrators while minimizing the police violence and injuries caused by the police.

84.     As part of this cover-up and failure to hold officers accountable for the excessive force, on being confronted with a photograph of Ms. Gaffett's injuries, which were inflicted by defendants on May 29, CITY OF OAKLAND officials stated falsely and publicly that the

photograph was a hoax and depicted someone in Texas.

85.    Defendants' acts were willful, wanton, malicious, and oppressive, and done with conscious disregard and deliberate indifference for plaintiff's rights and safety, justifying an award of punitive damages.

86.    As a direct and proximate result of the conduct of defendants described herein, plaintiffs have been denied their constitutional, statutory and legal rights as stated below, and have suffered general and special damages, including but not limited to, pain, suffering, humiliation, emotional distress, fear, anxiety, disabilities, medical and related expenses, and other damages in amounts according to proof.

87.    Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs in amounts to be determined according to proof.

### VII. MONELL AND SUPERVISORY LIABILITY ALLEGATIONS

88.    The constitutional violations alleged herein were the proximate result of decisions, orders, acts and omissions of the CITY OF OAKLAND'S authorized policymakers including but not limited to defendants MANHEIMER and ARMSTRONG; and ALAMEDA COUNTY's policymakers including but not limited to defendant AHERN.

89.    These decisions, orders, acts and omissions included the decisions by MANHEIMER, ARMSTRONG, AHERN, and DOE CITY OF OAKLAND and ALAMEDA COUNTY officials to approve the use of impact munitions, explosive grenades and pyrotechnic devices, and chemical weapons at the demonstrations, without sufficient justification, which resulted in such weapons being used in an unconstitutional, indiscriminate, unnecessary, and excessive manner.

90.    These decisions, orders, acts and omissions which caused the constitutional violations also included a tacit or explicit agreement by MANHEIMER, ARMSTRONG, AHERN, and

DOE CITY OF OAKLAND and ALAMEDA COUNTY officials to encourage or allow ACSO personnel and other mutual aid personnel to take front line positions at the May 29 and June 1, 2020, demonstrations and encourage ACSO (and other mutual aid agencies) to use dangerous force and weapons on demonstrators that are constitutionally excessive, and prohibited under OPD's Crowd Control Policy, and without command and control by OPD, which resulted in such weapons being used in an unconstitutional, indiscriminate, unnecessary, and excessive manner.

91.     These decisions, orders, acts and omissions which caused the constitutional violations also included the decision for ALAMEDA COUNTY and the CITY OF OAKLAND to declare a curfew on June 1, which was unconstitutional as further explained below, and used as a pretext for wrongful arrests of Ms. BROWN and others.

92.     In addition, MANHEIMER, ARMSTRONG, AHERN, and DOE City officials and County officials caused the CITY OF OAKLAND police officers' and ALAMEDA COUNTY Sheriff's officers' constitutional violations complained of herein by failing to provide adequate policies, training, supervision, and command of their officers assigned to the May 29- June 1, 2020, demonstrations to stop the officers from using excessive force, making wrongful arrests, and depriving plaintiffs and class members of their First Amendment rights. This failure to provide adequate policies, training, supervision, and command included, *inter alia:*

- MANHEIMER, ARMSTRONG, and other CITY OF OAKLAND officials failed to provide OPD officers assigned to the 2020 demonstrations with sufficient, regular training on the OPD Crowd Control Policy, constitutional restrictions on the use of force, particularly in the context of crowd events and First Amendment events, and lawful crowd management and crowd control tactics.

- MANHEIMER, ARMSTRONG and other CITY OF OAKLAND officials chose not to brief the ACSO and other mutual aid officers assigned to the 2020 demonstrations on the Crowd Control Policy and on OPD's Unity of Command structure under which only OPD Commanders may authorize the use of less lethal munitions for crowd control, and allowed them to operate outside of OPD's command and control and without restrictions.

- MANHEIMER, ARMSTRONG, and other CITY OF OAKLAND officials, and AHERN and other ALAMEDA COUNTY officials, allowed and encouraged ALAMEDA COUNTY and other mutual aid officers assisting OAKLAND at the subject demonstrations to bring and use munitions of a type and in an unconstitutionally excessive manner which are specifically prohibited by OAKLAND's Crowd Control Policy because they are highly dangerous, indiscriminate, and likely to cause constitutional violations and other injuries, and they did cause constitutional violations complained of herein, to the extent plaintiffs were injured by ACSO or other mutual aid officers.

- AHERN and other ALAMEDA COUNTY officials failed to provide ACSO and other mutual aid officers assigned to the 2020 demonstrations with adequate policies, command and control, and training on constitutional restrictions on the use of force, particularly in the context of crowd events and First Amendment events, and lawful crowd management and crowd control tactics.

- AHERN (explicitly or tacitly) made known to ACSO officers that, while providing mutual aid at the 2020 Floyd demonstrations, they need not adhere to restrictions on the use of dangerous munitions and chemical weapons in crowds or follow OPD's

unity of command structure as to use of force, *which he knew would likely result, and did result in such weapons being used in an unconstitutional, indiscriminate, unnecessary, and excessive manner.*

93.    Plaintiffs further allege that the constitutional violations alleged herein were the proximate result of a repeated course of conduct by members of the OPD and ACSO tantamount to a custom, policy, pattern or repeated practice of condoning, ratifying and/or tacitly encouraging the abuse of police authority, and disregard for the constitutional rights of citizens, including the rights of the plaintiffs and class members.

94.    Plaintiffs are further informed and believe and thereon allege that the constitutional violations alleged herein were the proximate result of a custom, policy, pattern or practice of deliberate indifference by defendants CITY OF OAKLAND and ALAMEDA COUNTY to the repeated violations of the constitutional rights of citizens by defendants' law enforcement officers, which have included, but are not limited to, the repeated use of excessive force, and the repeated failure to properly and/or adequately train, supervise and/or discipline officers with respect to the use of excessive force, constitutional limitations on the use of force; the repeated failure by CITY OF OAKLAND and ALAMEDA COUNTY's high ranking officials, OPD and ACSO managers and/or supervisors to hold officers accountable for violating the rights of citizens; and/or other customs, policies and/or practices subject to continuing discovery.

95.    The CITY OF OAKLAND's customs, policies, pattern and practice of condoning, ratifying, tacitly encouraging, and deliberate indifference to officers' constitutional violations are exemplified by the following facts:  In 2003, the United States District Court approved a negotiated settlement agreement (NSA) placing the Oakland Police Department under the Court's supervision until such time as it had implemented a number of specified reforms to hold

OPD officers accountable for violating people's rights and to prevent excessive force and other police misconduct. *Allen v. City of Oakland*, USDC ND Cal. No. 3:00-cv-04599. The NSA reforms were initially planned to take place within five years. However, in more than eighteen years now, the CITY OF OAKLAND and OPD has failed to fully implement the required reforms. And in 2005, the CITY OF OAKLAND and OPD first agreed to follow, train on, and implement the OPD Crowd Control Policy, as described in ¶ 3 above. Yet, for sixteen years now, almost every time that there is an upsurgence of demonstration activity in Oakland, such as during the Justice for Oscar Grant movement, the Occupy Oakland movement, and the 2020 George Floyd demonstrations, OPD and mutual aid assisting OPD have violated OAKLAND's own Policy, invariably causing the violation of demonstrators' constitutional rights.

96.     ALAMEDA COUNTY's customs, policies, pattern and practice of condoning, ratifying, tacitly encouraging, and deliberate indifference to officers' constitutional violations are exemplified by the following facts. During the economic justice demonstrations associated with the Occupy Oakland movement in 2011-2012, and subsequent demonstrations in which ACSO provided mutual aid to the CITY OF OAKLAND, deputies repeatedly used excessive force against unarmed and non-threatening demonstrators, causing serious injuries, but defendant AHERN failed to hold deputies accountable and has made a number of public statements condoning ACSO's use of weapons and force prohibited by the OPD Crowd Control Policy. AHERN has also failed to hold his deputies accountable for repeated abuses in other law enforcement contexts and in the ALAMEDA COUNTY Jail.  As of 2020, the ACSO led the region in wrongful deaths and excessive force payouts, with $27.6 million over five years. It

ranked third when analyzed per officer.[8] ALAMEDA COUNTY and AHERN have faced many

accusations of excessive force in the Alameda County Jail, and AHERN has made public

statements in support of deputies accused of excessive force. AHERN's actions in allowing

condoning, or encouraging deputies to use excessive force create an atmosphere where deputies

resort to unconstitutional excessive force because they are either encouraged to so, or at least

know they will not be punished.

97.     Plaintiffs are informed and believe that defendants MANHEIMER, ARMSTRONG,

HOLMGREN, WINGATE, AHERN, and DOE OPD and ACSO supervisors, and/or each of

them, caused the violation of the plaintiffs' constitutional rights as a result of their supervisory

malfeasance and/or deliberate indifference to the need for more or different training, supervision

and/or discipline of the CITY OF OAKLAND Police and ALAMEDA COUNTY Sheriff's

Office personnel assigned to the subject incident, to prevent the foreseeable violation of

plaintiffs' constitutional rights, as further discussed above.

### VIII. CLASS ACTION ALLEGATIONS

98.     Plaintiffs seek class certification pursuant to Fed.R.Civ.P. 23(a), and Fed.R.Civ.P.

23(b)(2), to pursue claims for injunctive and declaratory relief on behalf of themselves and all

persons similarly situated.

99.     The class is defined as all persons who have in the past participated, presently are

participating, or may in the future participate in, or be present at, demonstrations and crowd

events within the City of Oakland in the lawful exercise of their rights of free speech, assembly,

---

[8] https://oaklandside.org/2021/04/13/sheriff-candidates-alameda-county-sb271-gregory-ahern-law-enforcement-experience/

association, petition, and of the press, who have suffered physical injury to their body, or chilling of their speech, resulting from the conduct of defendants as described herein.

100.     This case satisfies the prerequisites of a Rule 23 class action. The class is so numerous that joinder of all members is impracticable. The class consists of hundreds or even thousands of people.

101.     There are questions of law and fact common to the class, in that the named plaintiffs claim that defendants' unlawful use of force and threats of force at the demonstrations described herein, were based on OPD and ACSO policies and orders that were unlawful and chilled their First Amendment rights.

102.     The questions of law and/or fact which predominate over any question affecting only individual class members include whether defendants improperly declared an unlawful assembly depriving peaceful participants of their First Amendment rights, whether defendants used excessive force against peaceful participants, whether defendants' motivation was to deprive participants of their First Amendment rights, and whether defendants engaged in racial, content and viewpoint-discrimination.

103.     By ordering and allowing officers to use unjustified force on the crowd at the demonstrations, and failing to implement policies prohibiting such use of excessive force and requiring OPD to brief mutual aid agencies on the Crowd Control and Crowd Management Policy, ensure they do not bring or use any weapons or force that is prohibited under this policy, and not assign mutual aid to front-line positions unless there is a public safety emergency, defendants have acted on grounds generally applicable to the class, so that injunctive and declaratory relief is appropriate respecting the class as a whole.

104.     The questions of law and fact common to the classes, which are outlined above, predominate over any questions affecting only individual members.

105.     The claims of the named plaintiffs are typical of the claims of the class in that the named plaintiffs and class members claim that their First Amendment rights have been chilled by the same misconduct of defendants and seek protection to bar the repeat of those violations in the future.

106.     The class representatives will fairly and adequately protect the interests of the class because they were subject to the unlawful law enforcement conduct complained of herein, and have no interests antagonistic to the class.

107.     The class representatives will fairly and adequately represent the common class interest. The class representatives have a strong interest in achieving the relief requested in this Complaint, they have no conflicts with members of the plaintiff class, and they will fairly and adequately protect the interests of the class.

108.     The class representatives are represented by counsel who are well-experienced in federal civil rights class action litigation and are familiar with the issues in this case.

109.     Counsel for the class representatives know of no conflicts among or between members of the class, the named plaintiffs, or the attorneys in this action.

110.     In accordance with FRCP Rule 23(b)(1)(A), the prosecution of separate actions by individual members of the class would create a risk of inconsistent or incompatible standards of conduct for the defendants, thereby making a class action the superior method of adjudicating the controversy.

111.     In accordance with FRCP Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the classes would create a risk of adjudications with respect to individual

members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

112.    In accordance with FRCP Rule 23(b)(2), defendants have acted on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## IX. CLAIMS FOR RELIEF

### COUNT ONE – INJUNCTIVE RELIEF

**(First, Fourth and Fourteenth Amendments, 42 U.S.C. § 1983; California Constitution Article 1 §§ 2, 3, 7, 13; Cal. Penal Code § 835.5;  Cal. Civil Code §§ 52.1, 815.6)**

<u>All Plaintiffs Against All Defendants</u>

113.    Plaintiffs reallege and incorporate herein by reference the preceding paragraphs of this Complaint.

114.    The Defendants engaged in repeated, widespread violations of law, as outlined above, over the course of at least several nights, using excessive force against hundreds if not thousands of protestors in retaliation for their protected First Amendment activity; imposing a curfew without accommodating the right to peaceable assembly and protest; declaring unlawful assemblies without adequate sound amplification and without providing adequate notice, means and opportunity to disperse before taking aggressive police action including the use of highly dangerous impact munitions / SIM, chemical weapons and explosive grenades; hitting large numbers of protestors with impact munitions / SIM, grenades, and using chemical weapons on them, all with unreasonable and excessive force; failing to provide medical aid or decontamination to persons defendants shot and/or teargassed; and unlawfully arresting and

detaining dozens of people.

115.    The CITY OF OAKLAND, through MANHEIMER, ARMSTRONG and the OPD, and ALAMEDA COUNTY, through AHERN and the ACSO, have failed to train their officers in the constitutional responses to demonstrations as revealed by the above allegations.

116.    Without intervention by this Court, the plaintiffs and class members, who have participated, observed or documented protest activities and wish to do so in the future, particularly related to police violence and racial justice, are at risk of having their rights violated in the future due to the defendants' demonstrated pattern of constitutional violations. The plaintiffs have no adequate remedy at law to protect the future lawful exercise of their constitutional rights, and, without action by this court, will suffer irreparable injury, thereby entitling them to injunctive and declaratory relief.

117.    The Defendants have acted and refused to act on grounds generally applicable to the putative class. Injunctive and declaratory relief for the class as a whole is appropriate.

118.    Defendants' policies, practices, customs, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to the plaintiffs, including but not limited to violations of their constitutional and statutory rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiffs intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in demonstrations, observation and documentation of demonstrations and police actions, and other expressive activities in the City of Oakland. Defendants' conduct described herein has created fear, anxiety and uncertainty among plaintiffs with respect to their exercise now and in the future of these constitutional rights.

119.    Specifically, plaintiffs are concerned that if they participate in, observe or document

protest activities in the City of Oakland they will again be subjected to unreasonable and excessive force by OPD and ACSO.

120.   Plaintiffs are concerned that, when they are engaged in protest activities, Defendants will impose curfews without accommodating or attempting to accommodate First Amendment rights; will not provide adequate notice of such curfews or in the event unlawful assemblies are declared; will not provide adequate means and opportunity to disperse; and will again employ indiscriminate, racially discriminatory, unreasonable or excessive force, injuring and terrifying protestors.

121.   Plaintiffs are also concerned that that if they participate in, observe or document protest activities in the City of Oakland they will be wrongfully detained and arrested by members of OPD and/or ACSO.

122.   Plaintiffs therefore seek injunctive relief from this court to ensure that plaintiffs and persons similarly situated will not suffer violations of their rights from defendants' illegal and unconstitutional policies, customs, and practices described herein.

123.   Plaintiffs seek injunctive relief in the form of an order prohibiting OPD and ACSO from using chemical weapons, explosive grenades, and impact munitions in crowds.

124.   Plaintiffs also seek injunctive relief in the form of an order requiring that defendants seal and destroy any records derived from the arrests for curfew violations, including but not limited to KIERRA BROWN, including fingerprints, photographs, and other identification and descriptive information, and all information, and biological samples and information obtained from such biological samples collected from such arrestees, and identify all entities and agencies to which such information has been disseminated; and that all such disseminated records be collected and destroyed.

## COUNT TWO – DECLARATORY RELIEF

### All Plaintiffs Against All Defendants

125.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

126.     An actual controversy exists between plaintiffs and defendants in that plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas plaintiffs are informed and believe that defendants contend that said policies, practices and conduct are lawful and constitutional. Plaintiffs therefore seek a declaration of rights with respect to this controversy pursuant to 28 U.S.C. §§ 2201-2202.

## COUNT THREE – 42 U.S.C. § 1983

## VIOLATION OF FIRST AMENDMENT RIGHTS

### All Plaintiffs Against All Defendants

127.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

128.     Plaintiffs' association with the anti-police violence/ racial justice demonstrations and observation and/or documentation of the police response were substantial and motivating factors for the defendants' use of excessive force on all of the plaintiffs, and in the case of KIERRA BROWN and class members, defendants' arrest of them. The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, chilled the plaintiffs' rights to freedom of speech, expression and association, under the First Amendment to the United States Constitution.

129.     The curfew order also violated and chilled the plaintiffs' First Amendment rights.

130.     As a result of Defendants' wrongful conduct, the plaintiffs suffered damages as alleged

above.

131.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the class is entitled to relief from the potential that such violations will recur.

132.    The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as detailed in ¶¶ 88-96 above. Defendants MANHEIMER, ARMSTRONG, HOLMGREN, and WINGATE, and DOE OPD and ACSO supervisors are liable based on supervisory liability as detailed in ¶¶ 88-97 above.

133.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT FOUR - 42 U.S.C. § 1983

### EXCESSIVE FORCE – U.S. Const., 4th and 14th Amds.

#### All Plaintiffs Against All Defendants

134.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

135.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs' rights to be free from excessive force, under the Fourth and Fourteenth Amendments to the United States Constitution.

136.    As a result of Defendants' wrongful conduct, the named plaintiffs suffered damages as alleged above.

137.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the class is entitled to relief from the potential that such violations will recur.

138.    The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as detailed in ¶¶ 88-

96 above. Defendants MANHEIMER, ARMSTRONG, HOLMGREN, and WINGATE, and DOE OPD and ACSO supervisors are liable based on supervisory liability as detailed in ¶¶ 88-97 above.

139.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT FIVE –42 U.S.C. § 1983**

**WRONGFUL ARREST – U.S. Const., 4th and 14th Amds.**

<u>Plaintiff KIERRA BROWN and the CLASS Against Defendants CITY OF OAKLAND, MANHEIMER, ARMSTRONG and WINGATE.</u>

140.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

141.     There was no probable cause to support the arrests of KIERRA BROWN and the CLASS. Therefore, the acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, violated plaintiffs' rights to be free from wrongful arrest, under the Fourth and Fourteenth Amendments to the United States Constitution.

142.    Defendants' above-described conduct violated BROWN and the class members' rights to be free from unreasonable seizures under the Fourth Amendment and under the Fourteenth Amendment's due process clause and the state constitutional analogues.

143.    As a result of Defendants' wrongful conduct, and the potential that such conduct will recur, the Class is entitled to relief from the potential that such violations will recur.

144.    The CITY OF OAKLAND is liable under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as detailed in ¶¶ 88-96 above. Defendants MANHEIMER, ARMSTRONG, and WINGATE, and DOE OPD supervisors are liable based on supervisory liability as detailed in ¶¶ 88-97 above.

145.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT SIX – 42 U.S.C. § 1983

### Conspiracy to Deprive Plaintiffs of Their Constitutional Rights

<u>All Plaintiffs Against All Defendants</u>

146.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

147.    Each of the named and unidentified DOE Defendant Officers along with Defendants CITY OF OAKLAND, CHIEF MANHEIMER, CHIEF ARMSTRONG, CHIEF HOLMGREN, CAPTAIN WINGATE, ALAMEDA COUNTY, and SHERIFF AHERN, acted in concert with each other and conspired by concerted action to accomplish an unlawful purpose by unlawful means.

148.    Each of the Defendants took concrete steps to enter into an agreement to unlawfully use excessive force on Plaintiffs without cause, for the purpose of breaking up the demonstrations and violating Plaintiffs' First and Fourth Amendment rights.

149.    Specifically, the CITY OF OAKLAND adopted policies prohibiting the use of impact munitions for crowd control because such weapons are inherently indiscriminate and dangerous and thus violate demonstrators and bystanders' constitutional rights by causing serious injuries without justification (see ¶¶ 34-37), but CITY OF OAKLAND officials, including but not limited to CHIEF MANHEIMER, CHIEF ARMSTRONG and CHIEF HOLMGREN, knowing that SHERIFF AHERN condoned the excessive use of impact munitions on crowds and knowing the risks thereof, deliberately placed ALAMEDA COUNTY personnel on the front lines at the demonstrations and encouraged or allowed them to use these highly dangerous weapons on Oakland demonstrators, for the purpose of expediently breaking up the demonstrations with unconstitutional force and violating the demonstrators and bystanders' First and Fourth

Amendment rights. See ¶¶ 39, 41, and 89-96.

150.     Defendants CITY OF OAKLAND, CHIEF MANHEIMER, CHIEF ARMSTRONG, CHIEF HOLMGREN, ALAMEDA COUNTY, and SHERIFF AHERN, took concrete steps to enter into an agreement with DOE Defendants to retroactively justify and cover up Defendant Officers' unwarranted use of excessive force on all Plaintiffs for the purpose of violating Plaintiffs' First and Fourth Amendment rights, as detailed in ¶¶ 83-84 and below.

151.     In furtherance of this conspiracy, each of the Defendant Officers committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by using unwarranted, excessive force on all Plaintiffs, including, but not limited to, using CS Blast and Stinger grenades to break up lawful demonstrations, shooting dangerous impact munitions at protestors without justification, and firing chemical weapons into lawful crowds, as detailed in ¶¶ 42-76.

152.     Defendants CITY OF OAKLAND, CHIEF MANHEIMER, CHIEF ARMSTRONG, CHIEF HOLMGREN, ALAMEDA COUNTY, and SHERIFF AHERN, committed additional specific overt acts, misusing their powers as high-ranking officials for the purpose of violating Plaintiff's rights. They accomplished this goal by using ACSO officers brought in as mutual aid to suppress the Oakland demonstration with excessive force, using unreasonably dangerous weapons in an indiscriminate manner that violated the plaintiffs' constitutional rights; by issuing an unconstitutional curfew order without adequate notice and directing Defendant Officers to enforce the order against Plaintiffs. Further, they covered up Defendant Officers' violations of Plaintiffs' constitutional rights by falsely claiming that the police were under attack by "violent disruptors" and "professional agitators" who were "stacking up bottles" and "making Molotov cocktails" to throw at the police prior to the police use of force; and by falsely claiming that a

photograph depicting plaintiff GAFFETT's injuries was a hoax and depicted someone in Texas. AHERN and ACSO furthered this cover-up by refusing to turn over ACSO's body camera videos and reports to OPD Internal Affairs, such that OPD could avoid including ACSO's use of force in its investigation of these incidents, despite OPD's accountability processes being under federal court oversight.

153.    Each individual named or unknown Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

154.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages as alleged above.

155.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT SEVEN – 42 U.S.C. § 1983

### Failure to Intervene

### All Plaintiffs Against All Defendants

156.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

157.    During the events described above, the defendants stood by without intervening to prevent the violations of plaintiffs' constitutional rights heretofore alleged, even though the violations occurred in plain view of numerous CITY OF OAKLAND Police Officers and ALAMEDA COUNTY Sheriff Officers and the defendants had the opportunity and duty to do so.

158.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for plaintiffs' clearly established constitutional rights.

159.    As a result of defendants' wrongful conduct, all of the plaintiffs suffered damages as alleged above.

160.    As a result of defendants' wrongful conduct, and the potential that such conduct will recur, plaintiffs and the class are entitled to relief from the potential that such violations will recur.

161.    The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as detailed in ¶¶ 88-96 above. Defendants MANHEIMER, ARMSTRONG, HOLMGREN, and WINGATE, and DOE OPD and ACSO supervisors are liable based on supervisory liability as detailed in ¶¶ 88-97 above.

162.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT EIGHT – CALIFORNIA BANE ACT

#### All Plaintiffs Against All Defendants

163.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

164.    The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, constituted interference, and attempted interference, by threats, intimidation and coercion, with plaintiffs' peaceable exercise and enjoyment of rights secured by the Constitution and laws of the United States and the State of California, in violation of California Civil Code § 52.1.

165.    As a result of defendants' wrongful conduct, all of the plaintiffs and damages class members suffered damages as alleged above.

166.    As a result of defendants' wrongful conduct, and the potential that such conduct will

recur, plaintiffs and the class are entitled to relief from the potential that such violations will recur.

167.    The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count based on respondeat superior.

168.    The violations and harm described herein were proximately caused by defendants MANHEIMER, ARMSTRONG, HOLMGREN, WINGATE, AHERN, and DOE OPD and ACSO supervisors by showing supervisory indifference or tacit authorization of subordinates' misconduct and abuse of authority while on duty and exercising their authority as a police officer, proximately causing the injuries described above. (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 209.) Each defendant supervisor had actual or constructive knowledge of defendants' wrongful conduct; (2) the supervisor's response was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) the existence of an affirmative causal link has been established between the supervisor's inaction and plaintiff's injuries. (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1279–1280.)

169.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## COUNT NINE – CALIFORNIA RALPH ACT

### All Plaintiffs Against All Defendants

170.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

171.    Plaintiffs are informed and believe that bias against plaintiffs' perceived political affiliation with the protest against police violence and police racism, and bias against plaintiffs' perceived race, were motivating reasons for the defendants' above-described misconduct toward them.

172.   Defendants' above-described conduct violated plaintiffs' rights to be free from violence and intimidation by threat of violence because of their actual or perceived political affiliation and/or viewpoint, in violation of California Civil Code § 51.7.

173.   As a result of defendants' wrongful conduct, the plaintiffs suffered damages as alleged above.

174.   As a result of defendants' wrongful conduct, and the potential that such conduct will recur, the plaintiffs and class are entitled to relief from the potential that such violations will recur.

175.   The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count based on respondeat superior.

176.   The violations and harm described herein were proximately caused by defendants MANHEIMER, ARMSTRONG, HOLMGREN, WINGATE, AHERN, and DOE OPD and ACSO supervisors by showing supervisory indifference or tacit authorization of subordinates' misconduct and abuse of authority while on duty and exercising their authority as a police officer, proximately causing the injuries described above. (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 209.) Each defendant supervisor had actual or constructive knowledge of defendants' wrongful conduct; (2) the supervisor's response was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) the existence of an affirmative causal link has been established between the supervisor's inaction and plaintiff's injuries. (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1279–1280.)

177.   Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT TEN - ASSAULT AND BATTERY

<u>All Plaintiffs Against All Defendants</u>

178.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

179.   Defendants committed assault and battery on each of the plaintiffs, by shooting impact munitions at them and using chemical weapons and other force on them.

180.   Said acts by defendants and/or each of them were unreasonable and excessive uses of force.

181.   Plaintiffs did not consent to the use of force against them and were injured thereby.

182.   As a result of defendants' wrongful conduct, the plaintiffs suffered damages as alleged above.

183.   The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count based on respondeat superior.

184.   The violations and harm described herein were proximately caused by defendants MANHEIMER, ARMSTRONG, HOLMGREN, WINGATE, AHERN, and DOE OPD and ACSO supervisors by showing supervisory indifference or tacit authorization of subordinates' misconduct and abuse of authority while on duty and exercising their authority as a police officer, proximately causing the injuries described above. (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 209.) Each defendant supervisor had actual or constructive knowledge of defendants' wrongful conduct; (2) the supervisor's response was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) the existence of an affirmative causal link has been established between the supervisor's inaction and plaintiff's injuries. (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1279–1280.)

185.   Wherefore, the plaintiffs pray for relief as hereinafter set forth.

**COUNT ELEVEN – FALSE ARREST AND FALSE IMPRISONMENT**

PLAINTIFF KIERRA BROWN against CITY OF OAKLAND, MANHEIMER, ARMSTRONG, WINGATE, and DOES.

186.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

187.   Plaintiff KIERRA BROWN and class members were arrested without reasonable suspicion and without probable cause to believe that they had committed any crime.

188.   As a result of defendants' wrongful conduct, BROWN suffered damages as alleged above.

189.   As a result of defendants' wrongful conduct, and the potential that such conduct will recur, BROWN and the class are entitled to relief from the potential that such violations will recur.

190.   The CITY OF OAKLAND is liable under this count based on respondeat superior.

191.   The violations and harm described herein were proximately caused by defendants MANHEIMER, ARMSTRONG, WINGATE, and DOE OPD supervisors by showing supervisory indifference or tacit authorization of subordinates' misconduct and abuse of authority while on duty and exercising their authority as a police officer, proximately causing the injuries described above. (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 209.) Each defendant supervisor had actual or constructive knowledge of defendants' wrongful conduct; (2) the supervisor's response was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) the existence of an affirmative causal link has been established between the supervisor's inaction and plaintiff's injuries. (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1279–1280.)

192.   Wherefore, the plaintiffs pray for relief as hereinafter set forth.

### COUNT TWELVE – NEGLIGENCE

<u>All Plaintiffs Against All Defendants</u>

193.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

194.    Defendants, and/or each of them, individually and/or while acting in concert with one another, owed plaintiffs the duty to use reasonable care to avoid causing foreseeable injury and damage to plaintiffs during the events described in this Complaint the above-described acts and omissions of defendants breached the duty of care defendants owed to plaintiffs.

195.    In doing the acts and/or omissions as alleged herein, Defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of plaintiffs' injuries and damages as alleged in this Complaint.

196.    The CITY OF OAKLAND and ALAMEDA COUNTY are liable under this count based on respondeat superior.

197.    The violations and harm described herein were proximately caused by defendants MANHEIMER, ARMSTRONG, HOLMGREN, WINGATE, AHERN, and DOE OPD and ACSO supervisors breaching their duties to supervise subordinates, which caused the officers' misconduct and abuse of authority while on duty and exercising their authority as a police officer, proximately causing the injuries described above. Each defendant supervisor had actual or constructive knowledge of other defendants' wrongful conduct or risk thereof; the supervisor's supervision was so inadequate as to show a breach of duty, causing plaintiffs' and class members injuries.

198.    Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## X. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1.      For an order certifying the class pursuant to Federal Rules of Civil Procedure 23(b)(2);

2.      For preliminary and permanent injunctive relief restraining defendants from engaging in the unlawful and unconstitutional actions complained of above;

3.      For a declaratory judgment that defendants' conduct complained of herein violated plaintiffs' rights under the Constitution and laws of the United States and California;

4.      For past, present and future general damages for the named individual plaintiffs, including but not limited to, pain, suffering, permanent disfigurement and/or emotional distress to be determined according to proof;

5.      For past, present and future special damages for the named individual plaintiffs, including, but not limited to, medical expenses, lost wages, damage to career and/or other out of pocket losses to be determined according to proof;

6.      For punitive damages against the individual defendants and/or each of them, to be determined according to proof;

7.      For statutory damages and exemplary damages pursuant to Cal. Civil Code §§ 52 and 52.1, to be determined according to proof, and for a $25,000 civil penalty per violation pursuant to Cal. Civil Code § 52 for each plaintiff;

8.      For pre- and post-judgment interest as permitted by law;

9.      For attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52 and 52.1, and/or other authorities, to be determined according to proof;

10.     For costs of suit;

11.     For such other and further relief as the Court may deem just and proper.

## XI. CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

## XII. JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Dated: October 21, 2021          Respectfully submitted,

/S/ *Rachel Lederman*
Alexsis C. Beach & Rachel Lederman, Attorneys
Flynn Law Office
Attorneys for plaintiffs